**\*NOT FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | : | |
| LOUIS PIERCE, | : | |
| | : | |
|         Petitioner, | : | Civ. No. 11-5265 (FLW) |
| | : | |
|     v. | : | |
| | : | **OPINION** |
| GREG BARTKOWSKI et al., | : | |
| | : | |
|         Respondents. | : | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | : | |

**<u>FREDA L. WOLFSON, U.S.D.J.</u>**

**I.      INTRODUCTION**

Petitioner, Louis Pierce ("Pierce" or "Petitioner"), is a state prisoner incarcerated at New Jersey State Prison, in Trenton, New Jersey.  Acting *pro se*, he commenced this habeas proceeding under 28 U.S.C. § 2254; Petitioner is, however, represented by appointed counsel at this stage of the litigation.  Respondents, Greg Bartkowski and Paula T. Dow (collectively, "Respondents"), filed an answer to the Petition, and Pierce filed a reply.  (ECF Nos. 19 & 23.)  On February 9, 2018, the Court held an evidentiary hearing limited to the question of whether Petitioner received ineffective assistance of counsel in connection with his trial counsel's alleged failure to adequately advise him concerning his right to testify.  (*See* ECF Nos. 25 & 35.)  Following that hearing, the Court received supplemental briefing from the parties.  (ECF Nos. 36–38.)  Having considered these submissions and the evidence adduced at the February 9, 2018 hearing, and for the following reasons, the Petition is **GRANTED** in part and **DENIED** in part as follows:  relief is denied on Ground One, claiming that the trial court erred in declining to hold a *Wade* hearing; relief is denied on Ground Two, claiming that the jury was tainted; relief is

denied on Grounds Three and Six, claiming defective jury instructions concerning the victim's

identification of Pierce; relief is denied on Ground Four, claiming that the conviction was against

the weight of the evidence; relief is granted on Point A of Ground Five, claiming that trial

counsel was ineffective by failing to adequately advise Pierce of his right to testify; relief is

denied on Points B and C of Ground Five, claiming that trial counsel was ineffective by failing to

object to a defense witness appearing in handcuffs and prison garb and failing to object to the

State's alleged presentation of hearsay; relief is denied on Point D of Ground Five, claiming that

trial counsel was ineffective by failing to advise Pierce of a plea offer; relief is denied on Points

E and F of Ground Five, claiming that trial counsel was ineffective by failing to move for a

*Wade* hearing and failing to object to allegedly misleading statements by the State in opposing a

*Wade* hearing; relief is denied on Points G, H, I, and J of Ground Five, claiming that trial counsel

was ineffective for other reasons; and relief is denied on Ground Seven, claiming defective jury

instructions concerning the charge of attempted murder.

## II.     BACKGROUND

### a.  Underlying Facts and the Trial

The Appellate Division, in its opinion affirming the first denial of post-conviction relief,

summarized the underlying facts as follows:[1]

> On November 5, 1996, Mike Rozier and Bart Merriel[[2]]
> drove to Camden from the home of Rozier's mother in
> Cinnaminson.  While on their way to a restaurant owned by
> Rozier's brother, Rozier and Merriel stopped at the McGuire
> projects around 10:45 p.m. to talk to a group of people, which

---

[1]  Pierce has incorporated these facts into his briefing, but "[w]ithout conceding the accuracy of the testimony offered at trial," particularly not Rozier's testimony.  (*See* Post-Hr'g Br. in Supp., ECF No. 36, at 3.)

[2]  Other sources spell his name as "Merrill."  (*See, e.g.*, Ans., Ex., Tr. of Pre-trial Conf. (June 12, 2000), *State v. Pierce*, Indict. No. 3008-09-98 (N.J. Super. Ct. Law Div., Camden Cty.), ECF No. 19-44, at 6–9.)

included Jerome Williams, a man named Daron, a man named Lou, James Hymon, a girl, and defendant, with whom Rozier spoke and shook hands. Rozier had talked to defendant "three or four times" over the previous "four or five years," although he did not know defendant's name at the time. Everyone was drinking liquor, and Rozier and defendant were sniffing cocaine.

While Rozier and Merriel were preparing to leave shortly after midnight, Rozier, standing approximately thirteen yards from defendant, saw defendant pull out a gun and shoot Merriel. Rozier testified that he yelled at defendant and moved toward him, at which point defendant, while facing Rozier, shot Rozier twice in the abdomen and once in the right hand. Defendant then walked away after the shooting.

Williams, on the other hand, testified at trial that Lou, not defendant, did the shooting. When asked if defendant was the man named "Lou," Williams responded, "No. No." Hymon also contradicted Rozier, testifying at trial that he was introduced to a man named "Lou" that night. Hymon testified, "The guy Lou pulled out the gun and . . . shot Bart and then Mike at the same time, Mike Rozier was walking away before any shooting occurred, he had started walking away and after he shot Bart then he shot Mike."

Williams, also known as Fidel,[3] drove Rozier and Merriel to Our Lady of Lourdes Medical Center, where Rozier received medical treatment and his clothes were removed.[4] Officer William Wiley testified that he followed the car carrying Rozier and Merriel to the hospital after observing it speeding. The driver identified himself as James Watson rather than Jerome Williams. When Wiley asked Merriel for his account of the shooting, Merriel, who was in the same room as Rozier, said, "Whatever Mike said was what happened." Rozier talked with the police and gave a description of his assailant.[5]

In the meantime, Sergeant Richard Desmond responded to the McGuire projects. Finding nothing of evidential value, Desmond proceeded to the hospital and spoke with Rozier.

---

[3] The Court notes that Williams, during his testimony at trial, denied being known as "Fidel," stating that Fidel was someone else from the neighborhood who was not present at the time of the shooting. (Ans., Ex., Tr. of Trial (June 14, 2000), *State v. Pierce*, Indict. No. 3008-09-98 (N.J. Super. Ct. Law Div., Camden Cty.), ECF No. 19-46, at 75, 83.)

"[4] A note with the name 'Lou' and a phone number written on it was later found in Rozier's jacket; Rozier knew nothing about the note, but the number apparently belonged to a business run by one Lou Budike."

"[5] Rozier was subsequently taken to Cooper University Hospital, where he underwent surgery and stayed for three weeks."

Desmond testified that Rozier rebuffed his attempts to obtain information; he did not recall speaking to Merriel.

Williams did not give a statement to the police at the hospital, but did so six days later on November 12, 2006. In that statement, Williams confirmed that "Lou" was at the crime scene. Williams was shown a photo array by the prosecutor's office at a later date; he testified that the shooter was not in that photo array but defendant's picture was there.

Hymon was questioned by the police shortly after the shooting, but he was released after Rozier and Merriel told the police he was not the shooter. Hymon testified that he was shown a photo array on February 25, 2000, but did not recognize anyone in it. Hymon also testified that defendant was not the shooter.[6]

Bruce Gilbert, an investigator with the Camden County Prosecutor's Office, testified to the photo array he showed Williams at the prosecutor's office. Gilbert confirmed that Williams did not recognize anyone in the array in any manner, even after he asked Williams if anyone in the array was present the night of the shooting. Gilbert also testified that he showed Hymon the same photo array he showed Williams. Gilbert stated that Hymon recognized defendant in the photo array but said the shooter was not in it. Hymon also viewed a photocopy of a lineup and did not see the shooter in it.

After Rozier left Cooper University Hospital, he stayed at his mother's house. He did not go to the police and did not give a formal statement. However, on November 10, 1997, a year after the shooting, Rozier met with a police officer he knew as "Peppy" and gave a taped statement. Rozier was also shown two photo arrays, one large and one small, which he believed contained the same pictures. Rozier identified defendant in both photo arrays as the shooter. Rozier also identified defendant in court as his assailant, saying he was "positive" that defendant was the shooter and "I don't forget nobody shooting me for nothing."

Detective Jerome Boyd, the officer known as "Peppy," was assigned to investigate the shooting approximately a year after it happened. Boyd confirmed that Rozier looked at the two photo arrays and gave a taped statement. Boyd said that Rozier "picked [defendant] right out" of both arrays, after which Boyd told Rozier the name of the person he identified. Boyd testified he had no other involvement in the case other than taking Rozier's statement, showing the photo arrays, issuing a warrant, and charging defendant.

---

"[6] Hymon, who was in a work release program at the time of trial, was called to testify as a defense witness. He appeared in court in handcuffs because he had violated his parole by possessing a controlled dangerous substance. No objection was made to his appearing in handcuffs."

Merriel never talked to the police because, according to Rozier, Merriel did not want to cooperate with them. Rozier testified that Merriel had problems with defendant in the past. Merriel died before the trial commenced from causes unrelated to the shooting.

At trial, defendant called Marla Wallace, defendant's girlfriend of twenty-one years, as an alibi witness. Wallace and defendant were living together in Philadelphia in November 1996. Wallace first heard about the shooting on the news at 5:30 a.m. one weekday, although she could not remember the specific date. Wallace testified that defendant was with her when she heard the news. Wallace said that Merriel was a "friend of the family" and to her knowledge, there were no bad feelings between defendant and Merriel. Wallace also twice spoke with defendant's investigator; neither time did she tell the investigator about the news report, but she did tell the investigator that she knew Merriel.

In rebuttal, the State called Cathy Simons, an employee in the news department of WPVI TV Channel Six, to testify. Simons examined the logs and transcripts for the November 6, 1996, newscast that aired at 5:30 a.m. She found no record of any news story about the shooting during the 5:30 a.m. show. The first time her station aired a story about the shooting was during the 5:00 p.m. Action News telecast on November 6. Gilbert was also called to rebut Wallace and testified that he spoke with her on June 14, 2000, before she testified. Wallace told him for the first time that day that she was going to testify about hearing a television news broadcast on Channel Six Action News at 5:30 a.m.

(Ans., Ex., Op. (July 26, 2010), *State v. Pierce*, No. A-0907-07T4 (N.J. Super. Ct. App. Div.), ECF No. 19-25, at 3–8 (omission, alteration, & footnotes [4] through [6] in original) (available at *State v. Pierce*, 2010 WL 2990765).

A jury convicted Pierce of two counts of attempted first-degree murder, under New Jersey Statutes Annotated §§ ("N.J.S.A.") 2C:11-3(a) and 2C:5-1, two counts of second-degree aggravated assault, under N.J.S.A. 2C:12-1(b)(1), one count of second-degree possession of a weapon for an unlawful purpose, under N.J.S.A. 2C:39-4(a), one count of third-degree unlawful possession of a handgun, under N.J.S.A. 2C:39-5(b), one count of third-degree aggravated assault, under N.J.S.A. 2C:12-1(b)(2), and one count of second-degree possession of a weapon

by a convicted felon, under N.J.S.A. 2C:39-7.  (Ans., Exs., Jury Verdict, *State v. Pierce*, Indict.

No. 3008-09-98 (N.J. Super. Ct. Law Div., Camden Cty.), ECF No. 19-3; J. (July 21, 2000),

*State v. Pierce*, Indict. No. 3008-09-98 (N.J. Super. Ct. Law Div., Camden Cty.), ECF No. 19-4.)

After merging various convictions for sentencing purposes, Judge Irvin J. Snyder ("Judge

Snyder"), who presided over the trial, sentenced Pierce to life in prison with 25 years of parole

ineligibility, with various shorter terms running concurrently, and to a consecutive term of nine

years in prison with four and a half years of parole ineligibility.  (ECF No. 19-4.)

      **b.  Post-trial Proceedings**

      The Appellate Division affirmed Pierce's convictions and sentences, noting that it

"carefully examined all of defendant's contentions in light of the record and the applicable law

and [was] satisfied that they lack sufficient merit to warrant discussion in a written opinion."

(Ans., Ex., Op. (Feb. 10, 2003), *State v. Pierce*, No. A-1221-00T4 (N.J. Super. Ct. App. Div.),

ECF No. 19-10, at 4.)  The court further specifically found "no merit to any claims of error with

respect to the identification."  (*Id.*).  The Supreme Court of New Jersey denied a petition for

certification.  *State v. Pierce*, 827 A.2d 289 (N.J. 2003).

      In December 2003, Pierce filed a *pro se* petition for post-conviction relief ("PCR"), based

primarily upon alleged ineffective assistance of his trial counsel, Irene Ali ("Ali").  (*See* Ans.,

Ex., ECF No. 19-16.)  Assigned PCR counsel filed a brief in support of the petition on July 6,

2007.  (Ans., Ex., Br. in Supp., ECF No. 19-17.)  Following oral argument on September 10,

2007, the PCR Judge found that an evidentiary hearing was not required and denied the petition.

(Ans., Ex., Tr. of PCR Mot. (Sept. 10, 2007), *State v. Pierce*, Indict. No. 98-09-3008 (N.J. Super.

Ct. Law Div., Camden Cty.), ECF No. 19-50.)  The Appellate Division affirmed the denial, (ECF

No. 19-25), and the Supreme Court of New Jersey, again, denied certification, *State v. Pierce*, 13 A.3d 1290 (N.J. 2011).

    **c. The Habeas Petition**

Pierce filed a *pro se* habeas petition with this Court on September 14, 2011, which raises seven grounds for relief:

> - GROUND ONE – that "the trial court's failure to hold a Wade hearing on the issue of the unduly suggestive nature of the identification of Defendant by a witness deprived the Defendant of due process under the United States Constitution and the New Jersey State Constitution";

> - GROUND TWO – that "Defendant was denied a fair and impartial jury in violation of the United States Constitution Amendment VI and XIV";

> - GROUND THREE – that "the trial court's charge to the jury was inadequate and misleading therefore violating Defendant's right to a fair and impartial trial, contrary to the Sixth and Fourteenth Amendments of the United States Constitution";

> - GROUND FOUR – that "the verdict was against the weight of the evidence since the victim's identification of the Defendant as the shooter was unreliable and uncorroborated by any evidence in violation of Defendant's right to have his guilt proven beyond a reasonable doubt and due process of law in

violation of the United States Constitution Amendments V, VI, XIV";

- GROUND FIVE – that "Defendant was denied the effective assistance of trial counsel in violation of the United States Constitution Amendments V, VI, and XIV";

- GROUND SIX – that "the trial court failed to provide a jury instruction tailored to the facts as they pertained to identification, particularly where the sole defense was one of misidentification, den[ying] Defendant due process of law and the right to a fair trial contrary to the Sixth and Fourteenth Amendments of the United States Constitution"; and

- GROUND SEVEN – that "the trial court's instruction on attempted murder was defective as it invited a non-unanimous verdict, violating the Defendant's right to a fair and impartial trial, contrary to the Sixth and Fourteenth Amendments of the United States Constitution."

(Pet. & Addendum, ECF No. 1, at ECF pp. 27–47 (capitalization rectified).)  As Pierce indicated that the Petition included both exhausted and unexhausted claims, the Court granted a request to stay the proceeding while he returned to state court to exhaust his unexhausted claims.  (*See* Order (Oct. 12, 2011), ECF No. 3.)

### d.  The Second PCR Proceeding

During the stay, Pierce, represented by counsel, filed a second PCR petition in New Jersey Superior Court raising two theories of ineffective assistance of PCR counsel.  (*See* Ans.,

Ex., 2d Verified Pet., ECF No. 19-31.) The Superior Court dismissed these claims as procedurally barred, (Ans., Ex., Letter Order (Mar. 15, 2012), *State v. Pierce*, Indict. No. 98-09-3008 (N.J. Super. Ct. Law Div., Camden Cty.), ECF No. 19-32), and the Appellate Division affirmed, finding that the second petition was untimely, (Ans., Ex., Op. (Aug. 26, 2013), *State v. Pierce*, Docket No. A-3734-11T4 (N.J. Super. Ct. App. Div.), ECF No. 19-36, at 4 (available at *State v. Pierce*, 2013 WL 4503361). The New Jersey Supreme Court again denied certification. *State v. Pierce*, 88 A.3d 190 (N.J. 2014).

 **e. Resumption of Habeas Litigation**

 On April 22, 2014, the Court lifted the stay and ordered Respondents to answer the Petition. (ECF Nos. 5 & 6.) Respondents submitted their Answer on September 29, 2014. (Ans., ECF No. 19.) Pierce submitted his Reply on January 1, 2015. (Reply, ECF No. 23.)

 On May 31, 2017, the Court ordered that an evidentiary hearing would be held "limited to the question of whether Petitioner received ineffective assistance of counsel in connection with his trial counsel's failure to advise him of his right to testify" and noting specifically that "the hearing will address both the deficiency and prejudice prongs of *Strickland v. Washington*." (Order (May 31, 2017), ECF No. 25.) The Court subsequently appointed the law firm of Hangley, Aronchick, Segal, Pudlin & Schiller to represent Pierce during the hearing. (Order (Sept. 28, 2017), ECF No. 26.) This hearing occurred before the Court on February 9, 2018, during which the Court heard testimony only from Pierce, as the parties stipulated to the unavailability of Pierce's trial counsel, Irene Ali. (*See* Tr. of Evid. Hr'g (Feb. 9, 2018), ECF No. 35.) The litigants subsequently filed supplemental briefs addressing the issues raised during the hearing and, additionally, Pierce's claim that Ali was ineffective by failing to object to a defense

witness appearing to testify during the trial in handcuffs and prison garb.  (*See* ECF Nos. 36–38.)

The matter is now fully briefed and ready for disposition.


### III.    STANDARD OF REVIEW

Under 28 U.S.C. § 2254(a), a court may consider a claim alleging that a person is in state

custody "in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. §

2254(a).  A habeas petitioner has the burden of establishing each claim in such a petition.  *See*

*Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013).  Generally, a federal court may not grant a

writ of habeas corpus under § 2254 unless the petitioner has "exhausted the remedies available in

the courts of the State."  28 U.S.C. § 2254(b)(1)(A).  Under § 2254, as amended by the Anti–

Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244, ("AEDPA"), federal courts must

give considerable deference to determinations of the state trial and appellate courts.  *See Renico*

*v. Lett*, 559 U.S. 766, 772 (2010).

Section 2254(d) establishes the standard for granting or denying a writ of habeas corpus:

> An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the
> merits in State court proceedings unless the adjudication of the
> claim—
>
> > (1) resulted in a decision that was contrary to, or involved an
> > unreasonable application of, clearly established Federal
> > law, as determined by the Supreme Court of the United
> > States; or
> >
> > (2) resulted in a decision that was based on an unreasonable
> > determination of the facts in light of the evidence presented
> > in the State court proceeding.

28 U.S.C. § 2254(d).  Thus, where a state court adjudicated petitioner's federal claim on the

merits, a federal court thus "ha[s] no authority to issue the writ of habeas corpus unless the [state

court's] decision 'was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Parker v. Matthews*, 567 U.S. 37, 40 (2012) (quoting 28 U.S.C. § 2254(d)). "For the purposes of Section 2254(d), a claim has been adjudicated on the merits in State court proceedings when a state court has made a decision that 1) finally resolves the claim, and 2) resolves that claim on the basis of its substance, rather than on a procedural, or other, ground." *Shotts v. Wetzel*, 724 F.3d 364, 375 (3d Cir. 2013) (internal quotation marks and brackets omitted).

The petitioner carries the burden of proof, and review under § 2254(d) is limited to the record that was before the state court that adjudicated the claim on the merits. *See Harrington v. Richter*, 562 U.S. 86, 100 (2011); *see also Cullen v. Pinholster*, 563 U.S. 170, 180–81 (2011). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Accordingly, a habeas petitioner bears the burden of showing that the state-court decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103; *see also Dunn v. Madison*, 138 S. Ct. 9, 11 (2017), *reh'g denied* 138 S. Ct. 726 (2018).

"'[C]learly established law' for purposes of § 2254(d)(1) includes only 'the holdings, as opposed to the dicta, of [the Supreme Court's] decisions,'" as of the time of the relevant state-court decision. *White v. Woodall*, 572 U.S. 415, 419 (2014) (quoting *Howes v. Fields*, 565 U.S. 499, 505 (2012)). A decision is "contrary to" a Supreme Court holding for the purposes of §

2254(d)(1) if the state court "contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

Where a petitioner seeks habeas relief, pursuant to § 2254(d)(2), on the basis of an erroneous factual determination of the state court, two provisions of AEDPA necessarily apply. First, AEDPA provides that "a determination of a factual issue made by a State court shall be presumed to be correct [and] [t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see Miller–El v. Dretke*, 545 U.S. 231, 240 (2005). Second, AEDPA precludes habeas relief unless the adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

A federal court may not grant habeas relief if the state court's decision rests on a violation of a state procedural rule. *See Leyva v. Williams*, 504 F.3d 357, 365 (3d Cir. 2007). This procedural bar applies only when the state rule is "'independent of the federal question [presented] and adequate to support the judgment.'" *Id.* at 365–66 (alteration in original) (quoting *Nara v. Frank*, 488 F.3d 187, 196, 199 (3d Cir. 2007)); *see also Gray v. Netherland*, 518 U.S. 152, 162 (1996); *Coleman v. Thompson*, 501 U.S. 722, 732 (1991). Finally, if a federal

court determines that a claim has been defaulted, it may excuse the default only upon a showing of "cause and prejudice" or a "fundamental miscarriage of justice." *Leyva*, 504 F.3d at 366.

To the extent that a petitioner's constitutional claims are unexhausted or procedurally defaulted, a court may nevertheless deny them on the merits under § 2254(b)(2). *See Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007) ("Here, because we will deny all of [petitioner's] claims on the merits, we need not address exhaustion"); *Bronshtein v. Horn*, 404 F.3d 700, 728 (3d Cir. 2005) ("Under 28 U.S.C. § 2254(b)(2), we may reject claims on the merits even though they were not properly exhausted, and we take that approach here"). There is no argument here that any of Pierce's claims are unexhausted as he has previously raised each claim either on direct appeal or during his state PCR proceedings. (*See* ECF Nos. 6, 7, 16, 17, 22, 31, & 34.) As noted below, however, some claims must be considered procedurally defaulted.

## IV.     ANALYSIS

### a.  Ground One – Trial Court's Failure to Hold a *Wade* Hearing

In Ground One, Pierce asserts a claim, previously raised on direct appeal, that the trial court erred in failing to conduct a *Wade* hearing because Rozier's out-of-court identification of Pierce was tainted by his alleged viewing of photographic arrays on two separate occasions. (ECF No. 1 at ECF pp. 27–28.) An out-of-court identification may implicate due-process concerns when "law enforcement officers use[d] an identification procedure that is *both* suggestive and unnecessary." *Manson v. Brathwaite*, 432 U.S. 98, 107 (1977); *see also Neil v. Biggers*, 409 U.S. 188, 198 (1972). An identification procedure may be deemed unduly and unnecessarily suggestive if it is based on police procedures that create "a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968); *see also Biggers*, 409 U.S. at 197. The Supreme Court has explained that, when the

police use suggestive procedures, "the witness thereafter is apt to retain in his memory the image of the [misidentification] rather than that of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification."  *Simmons*, 390 U.S. at 383–84.

Nevertheless, it is insufficient to generally show that the identification "may have in some respects fallen short of the ideal."  *Id.* at 385.  Instead, "[i]t is the likelihood of misidentification which violates a defendant's right to due process."  *Biggers*, 409 U.S. at 198. As the Supreme Court explained,

> An identification infected by improper police influence . . . is not automatically excluded.  Instead, the trial judge must screen the evidence for reliability pretrial.  If there is a very substantial likelihood of irreparable misidentification, the judge must disallow presentation of the evidence at trial.  But if the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth.

*Perry v. New Hampshire*, 565 U.S. 228, 232 (2012) (internal quotation marks and citation omitted).

The Supreme Court has thus held that, even if improper procedures have rendered an identification unnecessarily suggestive, the admission of the suggestive identification does not violate due process so long as the identification possesses sufficient aspects of reliability, as reliability is the "linchpin in determining the admissibility of identification testimony." *Brathwaite*, 432 U.S. at 106, 114; *see also United States v. Wise*, 515 F.3d 207, 215 (3d Cir. 2008).  The central question in determining whether an improper identification may be admitted is "'whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive.'"  *Brathwaite*, 432 U.S. at 106 (quoting *Biggers*,

409 U.S. at 199); *see also United States v. Maloney*, 513 F.3d 350, 355 (3d Cir. 2008). In answering this question, a court should conduct a case-specific analysis, considering the following factors: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Biggers*, 409 U.S. at 199–200; *see also Simmons*, 390 U.S. at 384. In *Simmons v. United States*, in which the Supreme Court first substantively addressed the constitutional infirmities arising from unduly suggestive photographic arrays, the Court held "that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons*, 390 U.S. at 384. This has been generally interpreted as a condemnation of "the use of photo arrays in which the suspect's photograph 'is in some way emphasized.'" *Darden v. Wainwright*, 477 U.S. 168, 199 (1986) (quoting *Simmons*, 390 U.S. at 383).

The Supreme Court has more recently reiterated that a *Wade* hearing is warranted only if an identification is suggestive or improper as a result of conduct by the State. *Perry v. New Hampshire*, 565 U.S. 228, 231–48 (2012). In reaching this conclusion, the Court noted that "[a] primary aim of excluding identification evidence obtained under unnecessarily suggestive circumstances . . . is to deter law enforcement use of improper lineups, showups, and photo arrays in the first place." *Id.* at 241. Suggestive or potentially unreliable identifications that do not result from State conduct may be tested "through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at postindictment lineups, vigorous

cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt." *Id.* at 233. Accordingly, "the Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement." *Id.* at 248.

Here, the Appellate Division rejected Pierce's *Wade*-hearing claim on direct appeal, finding,

> There is no merit to any claims of error with respect to the identification. Defendant was known to Rozier, who identified him by sight. Defendant's further contention that the out-of-court proceeding was in any way unreliable is entirely unpersuasive. We are satisfied that Judge Snyder's decision not to hold a *Wade* hearing is supported by the evidence and that it was an appropriate exercise of his discretion.

(ECF No. 19-10 at 4.)

Pierce argues that a *Wade* hearing should have been held because the police officer showed Rozier "two different arrays . . . at two different times" and Rozier did not sign the array upon his first viewing, which implies that he "was not able to identify the defendant at his first viewing." (ECF No. 1 at ECF p. 27.) Pierce also claims that Rozier initially stated that he did not know who shot him, and that Rozier did not view the photographic arrays until a year after the shooting. (*Id.* at ECF pp. 27–28.) Pierce argues that Rozier's initial description of the shooter to police was never presented during the trial, preventing any comparison between the initial description and Rozier's eventual identification of Pierce.[7] (*Id.* at ECF p. 28.)

---

[7] Although Rozier did not testify as to his initial description to police of the shooter, the Court notes that Officer William Wiley read into the record a description in an initial police report of the suspect as "Black male, 30 years old, six foot, thin, brown leather jacket." (*See* Ans., Ex., Tr. of Trial (June 13, 2000), *State v. Pierce*, Docket No. 3008-09-98 (N.J. Super. Ct. Law Div., Camden Cty.), ECF No. 19-45, at 104–05.) No other specifics were given, and there was no testimony comparing Pierce to that description.

Ali, Pierce's trial counsel, raised these arguments when she sought a *Wade* hearing immediately before Rozier testified.  (*See* Ans., Ex., Tr. of Trial (June 13, 2000), *State v. Pierce*, Docket No. 3008-09-98 (N.J. Super. Ct. Law Div., Camden Cty.), ECF No. 19-45, at 4–14.) Though challenged to support this version of events, Ali did not identify any evidence that Rozier had viewed photographic arrays on two occasions or any precedent demonstrating that such a procedure would render an identification unduly suggestive.  (*See id.*)  Judge Snyder found that, even if Rozier had viewed photographic arrays on two occasions, there was no showing that the identification was improperly suggestive, and he consequently declined to hold a *Wade* hearing.  (*Id.* at 11–14.)

Furthermore, the argument that Rozier initially viewed one version of a photographic array and did not identify any person as the shooter, but later viewed another version of the array and only then identified Pierce—is contradicted by all relevant testimony from the trial. Contrary to Pierce's claim, Rozier testified that the two arrays were given to him on the same day and that he identified Pierce in both arrays.  (ECF No. 45 at 51–55, 70–71.)  Rozier further testified that, while one array used smaller color photographs and the other used black-and-white enlargements, the pictures in each were the same.  (*Id.* at 52–55.)  Rozier stated that he signed and dated the arrays on the same day, before giving a taped statement.  (*Id.* at 51–55.)  Rozier specifically denied ever looking at the photographic arrays on another date.  (*Id.* at 55.) Detective Jerome Boyd ("Boyd"), the officer who showed the photographic arrays to Rozier and took Rozier's statement, also testified that Rozier came in and looked at photographic arrays on only one occasion, albeit one year after the shooting.  (ECF No. 19-46 at 20–23, 27–28.)  Boyd further testified that Rozier picked Pierce "right out" when presented with the arrays.  (*Id.* at 21–22.)  There is nothing before this Court indicating that Rozier viewed photographic arrays on two

different occasions or, even were that the case, that such a procedure should be considered unduly suggestive or inherently unreliable. [8] Notably, Pierce does not raise any argument that some feature of the arrays themselves rendered them unduly suggestive. (*See* ECF No. 1 at ECF pp. 27–28.) Therefore, it was not an unreasonable application of law or determination of facts for the Appellate Division to reject the argument that a *Wade* hearing was required. Arguments related to the reliability of an identification—such as those now raised by Pierce concerning the long delay preceding Rozier's identification, questions as to Rozier's sobriety at the time of the shooting, and any comparison of Rozier's initial description to police with Pierce's photograph—do not come into play on a *Wade* analysis unless it is first shown that police caused the identification procedure to be unduly suggestive. *See Perry*, 565 U.S. at 248. These issues may, instead, be addressed in other ways at trial, such as by cross examination, expert testimony, or jury instructions. *See id.* at 233. Accordingly, Pierce has not shown that habeas relief is warranted on Ground One, and such relief is denied on that ground.

> **b. Ground Two – Alleged Juror Taint**

Ground Two of Pierce's Petition presents another claim that he previously raised on direct appeal, namely that members of the jury were tainted by exposure to a newspaper article concerning the case. (*See* ECF No. 1 at ECF p. 29.) The Sixth Amendment guarantees a criminal defendant "the right to a . . . trial[] by an impartial jury." U.S. Const. amend VI; *see also Murphy v. Florida*, 421 U.S. 794, 799–800 (1975); *Irvin v. Dowd*, 366 U.S. 717, 721–23

---

[8] The Appellate Division also noted that Rozier knew Pierce by sight, even if not by name. This appears to be a reasonable conclusion that, even had the out-of-court identification been unduly suggestive, it nonetheless remained reliable because Rozier knew the person he was picking out from the array—the identification was merely a matter of recognition. *See, e.g.*, *United States v. Marsh*, 644 F. App'x 5, 7 (2d Cir. 2016) (finding identification reliable in part because the witness knew the suspect); *see also State v. Morales*, 116 283 A.2d 127, 130 (N.J. Super. Ct. App. Div. 1971).

(1961). Generally, jurors are presumed to be impartial, and it "is sufficient if the juror can lay

aside his impression or opinion and render a verdict based on the evidence presented in court."

*Irvin*, 366 U.S. at 723. As the Supreme Court has recently reiterated, "juror *impartiality* . . . does

not require *ignorance*." *Skilling v. United States*, 561 U.S. 358, 381 (2010); *see also Mu'Min v.

Virginia*, 500 U.S. 415, 430 (1991). Thus, removal is required only upon the showing of "'the

actual existence of such an opinion in the mind of the juror as will raise the presumption of

partiality.'" *Irvin*, 366 U.S. at 723 (quoting *Reynolds v. United States*, 98 U.S. 145, 157 (1878)).

The proper remedy to address potential juror partiality is a hearing to assess actual bias—"due

process does not require a new trial every time a juror has been placed in a potentially

compromising situation." *Smith v. Phillips*, 455 U.S. 209, 215, 217 (1982).

When a party contends that members of the jury have been prejudiced by exposure to

publicity, courts must examine three prongs: (1) whether the publicity material is prejudicial; (2)

whether jurors were exposed to it; and (3) whether the impartiality of any exposed juror has been

compromised. *Barry v. Bergen Cty. Prob. Dep't*, 128 F.3d 152, 163 (3d Cir. 1997); *see also

United States v. DiSalvo*, 34 F.3d 1204, 1221–22 (3d Cir. 1994); *Waldorf v. Shuta*, 3 F.3d 705,

709–10 (3d Cir. 1993). *Voir dire* is the "appropriate method" for assessing potential juror

prejudice, and the party asserting prejudice bears "the burden of demonstrating the likelihood of

actual prejudice." *Waldorf*, 3 F.3d at 709–10; *see also United States v. Lloyd*, 269 F.3d 228, 238

(3d Cir. 2001); *Gov't of V.I. v. Dowling*, 814 F.2d 134, 139 (3d Cir. 1987).

Here, Pierce contends that the jury that convicted him was tainted by a juror reading an

article, during the trial, about the criminal case and about Merriel's death in 1998. (ECF No. 1 at

ECF p. 29.) While acknowledging that Judge Snyder excused the juror who read the article,

juror number three, Pierce contends that another juror "reported that juror number three

discussed this article with her" and that "the jurors reportedly had the newspaper in the deliberation room and were all reading it." (*Id.*) Based on these circumstances, Pierce argues that the conviction should be vacated because Judge Snyder excused only juror number three and that this incident "clearly influenced the other jurors and the outcome of the trial." (*Id.*)

As with Ground One, Pierce's characterization of the underlying events appears to be inconsistent with the actual trial record. Judge Snyder received a report at the start of the second day of trial that juror number three had admitted to juror number five that he had read a related newspaper article. (ECF No. 19-46 at 3.) The judge ultimately excused juror number three, without objection from the litigants, but permitted the other jurors to remain. (*Id.* at 3–17.) In doing so, Judge Snyder noted that he had read the article and that it was "relatively accurate and did not give any additional information except it did state that Merriel met his fate in 1998 as a result of a violent act"—a fact that the parties had previously withheld from the jurors. (*Id.* at 3–4.) In response to Judge Snyder's questioning, juror number five stated that juror number three had told her that he had read the article, but that "he didn't say anything about what he read, he just said it stated of the point [sic] where we were in the trial." (*Id.* at 4–6.) She further stated that she did not hear juror number five mention the article to other jurors, but she did mention that a copy of the newspaper was in the jury room and that the jurors were looking at a picture of Judge Snyder, which apparently appeared in the food section of the newspaper. (*Id.* at 6–7.) Following these questions, Judge Snyder determined that juror number five was not tainted and had the relevant newspaper section removed from the jury room. (*Id.* at 6, 8.) Judge Snyder also reminded the jurors of their duty to avoid outside media and inquired whether any other juror had read the article or spoken to anybody else about the article, which produced no response. (*Id.* at 12–14, 17.)

Here, Judge Snyder's actions addressing the possibility of jury taint were reasonable. The Judge individually questioned the potentially affected jurors, employed a searching *voir dire* of the entire jury, and ultimately excused juror number three. Judge Snyder's decision to remove the only directly affected juror, reiterate pertinent admonitions to the remaining jurors, and proceed with the trial, were not met with any objections from trial counsel. Furthermore, Judge Snyder stated that the material to which the disqualified juror was exposed consisted only of a newspaper article that factually, and accurately, recounted the trial, and that the substance of the article in no way was prejudicial to defendant, and only marginally extraneous. Hence, there was no constitutional error in failing to grant a mistrial *sua sponte*. The Appellate Division's denial of this claim therefore did not involve an unreasonable application of Supreme Court precedent or an unreasonable application of the facts. Accordingly, the Court denies habeas relief on Ground Two.

### c. Grounds Three, Six, & Seven – Challenges to Jury Instructions

In Grounds Three, Six, and Seven, Pierce raises challenges to Judge Snyder's jury instructions, which issues he previously raised on direct appeal. (ECF No. 1 at ECF pp. 29–31, 42–47.) The Supreme Court and Third Circuit have made clear that it is not the role of the federal courts to review state-court jury-instruction rulings that are based on state law; rather, the federal court's "task is to determine whether [a petitioner] 'is in custody in violation of the Constitution or laws or treaties of the United States.'" *Barkley v. Ortiz*, 209 F. App'x 120, 124 (3d Cir. 2006) (rejecting claim based on the failure to charge accomplice liability which was rooted in violations of state law) (quoting 28 U.S.C. § 2254); *see also Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). The general propriety of a jury charge typically poses a state-law

question, and is thus not subject to federal habeas review.[9]  *See Engle v. Isaac*, 456 U.S. 107, 121 n.21 (1982); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Zettlemoyer v. Fulcomer*, 923 F.2d 284, 309 (3d Cir. 1991).  "[T]he fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief."  *McGuire*, 502 U.S. at 71–72.

Rather, the only question the district court needs to address in this context is "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process,' . . . not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.'"  *Kibbe*, 431 U.S. at 154 (quoting *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973)).  The petitioner's "burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal."  *Id.*  Thus, a habeas petitioner who challenges state-court jury instructions must "point to a federal requirement that jury instructions on the elements of an offense . . . must include particular provisions" or demonstrate that the jury "instructions deprived him of a defense which federal law provided to him."  *Johnson v. Rosemeyer*, 117 F.3d 104, 110 (3d Cir. 1997).  Moreover, as the Supreme Court has indicated, the language of the jury instruction in question "must be considered in the context of the instructions as a whole and the trial record."  *McGuire*, 502 U.S. at 72; *see also Rompilla v. Horn*, 355 F.3d 233, 261 (3d Cir. 2004), *rev'd on other grounds sub nom. Rompilla v. Beard*, 545 U.S. 374 (2005).

---

[9]  Under federal law applicable in habeas review generally, matters of state law and rules of procedure are not reviewable.  The Supreme Court has stated that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *McGuire*, 502 U.S. at 67–68.  "It is well established that a state court's misapplication of its own law does not *generally* raise a constitutional claim.  The federal courts have no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." *Smith v. Horn*, 120 F.3d 400, 414 (3d Cir. 1997) (internal quotation marks and brackets omitted).

### i. Grounds Three and Six – Jury Instructions Regarding Identification

Grounds Three and Six of the Petition both appear to claim that the trial court's

identification charge to the jury was inadequate, misleading, and not tailored to the facts of the

case.[10]  (*See* ECF No. 1 at ECF pp. 29–31, 42–45.)  In that regard, Pierce contends that Judge

Snyder failed to deliver the complete identification jury charge, omitting the following two

paragraphs:

> Unless the in-court identification results from the observations or
> perception of the defendant by the witness during the commission
> of the crime rather than being the product of an impression gain
> [sic] of the out-of-court identification procedures, it should be
> afforded no weight.  Thus, the ultimate issue of trustworthiness of
> an in-court identification procedure is for you to decide.
>
> If after a consideration of all the evidence, you have a reasonable
> doubt as to the identity of the defendant as the person present at the
> time and place of the crime, you must acquit him.  If, however,
> after a consideration of all of the evidence you are convinced
> beyond a reasonable doubt of the defendant's presence at the
> scene, you must then consider whether the State has proved each
> and every element of the offense charged beyond a reasonable
> doubt.

(ECF No. 1 at ECF p. 31 (quoting New Jersey Model Jury Charges).)  Pierce also argues that

Judge Snyder "failed to incorporate the law to the jury in the contexts of the material facts of the

---

[10]  The heading for Ground Three reads, "The Trial Court's Charge to the Jury Was Inadequate
and Misleading Therefore Violating Defendant's Right to a Fair and Impartial Trial, Contrary to
the Sixth and Fourteenth Amendments of the United States Constitution," while the heading for
Ground Six reads, "The Trial Court Failed to Provide a Jury Instruction Tailored to the Facts as
They Pertained to Identification, Particularly Where the Sole Defense Was One of
Misidentification, Denied Defendant Due Process of Law and the Right to a Fair Trial Contrary
to the Sixth and Fourteenth Amendments of the United States Constitution."  (ECF No.1 at ECF
pp. 29, 42.)  While the text of Ground Six begins by asserting that "the court's failure to give an
instruction to the jurors on how to analyze and consider the factual issues of identification," the
gist of the argument seems to center on the fact that the verdict was against the weight of the
evidence.  (*Id.* at ECF pp. 43, 45.)  However, Pierce has separately asserted, in Ground Four, that
the verdict was against the weight of the evidence.  Accordingly, the Court will consider Ground
Six as duplicative of either Ground Three or Ground Four.

case." (*Id.*)  He contends that Judge Snyder failed "to give an instruction to the jurors on how to analyze or consider the factual issues of identification." (*Id.* at ECF p. 43.)  I note that, in considering jury instructions, "an omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Kibbe*, 431 U.S. at 155.

In delivering the jury instructions, Judge Snyder repeatedly stressed that the State had the burden of proving all elements of the charged crimes beyond a reasonable doubt and that the jurors must acquit if they had a reasonable doubt as to whether Pierce was present at the time of the crime. (*See, e.g.*, Ans., Ex., Tr. of Trial (June 20, 2000), *State v. Pierce*, Indict. No. 3008-09-98 (N.J. Super. Ct. Law Div., Camden Cty.), ECF No. 19-48, at 109–11.)  As the record reflects, Judge Snyder instructed the jurors:

> If after consideration of all the evidence, including the evidence of the defendant's whereabouts at the time of the offense, you have a reasonable doubt as to whether he committed or participated in the crime, you must find the defendant not guilty. If, however, after considering all of the evidence, you are convinced beyond a reasonable doubt of the defendant's presence at the scene of the crime and have concluded that the State has proven each and ever element of the offense charged in the indictment beyond a reasonable doubt, then you must find the defendant guilty.
>
> The defendant, as part of his general denial of guilt, contends that the State has not presented sufficient, reliable evidence to establish beyond a reasonable doubt that he is the person who committed the alleged offense.  Now when the identity of the person who committed the offense is at issue, the burden of proving that identity is upon the State.  The State must prove beyond a reasonable doubt that this defendant is the person who committed the crime.  The defendant has neither the burden nor the duty to show that the crime, if committed, was committed by someone else, or to prove the identity of the other person.
>
> You must determine, therefore, not only whether the State has proven each and every element of the offense charged beyond a reasonable doubt, but also whether the State has proven beyond a reasonable doubt that this defendant is the person who committed it.

Now you may recall that Mike Rozier came forward and he testified and identified the defendant in Court, and he identified the defendant as the person who committed the crime. According to the witness, Mr. Rozier, his identification of the defendant in Court is based upon his observations and perceptions which he made of the defendant on the scene at the time of the offense being committed and based upon his past familiarity with defendant.

It is your function as jurors to determine what weight, if any, to give to his testimony. You must decide whether it is sufficiently reliable evidence upon which to conclude that this defendant is the person who committed the offense charged.

If after consideration of all the evidence you have a reasonable doubt as to the identity of the defendant as the person present at the time and place of the crime, you must acquit. If, however, after consideration of all the evidence you are convinced beyond a reasonable doubt of the defendant's presence at the scene, you will then consider whether the State has proven each and every element of the offense charge [sic] beyond a reasonable doubt.

(*Id.* at 110–12.)

The record thus reveals that the jury instructions, in fact, addressed virtually every point that Pierce claims was erroneously omitted. Judge Snyder twice emphasized that if the jury had reasonable doubt as to whether Pierce was present at the time and place of the offense he must be acquitted and explained that, if the jury found Pierce was present, it still must find all elements of the crimes charged beyond a reasonable doubt. (*Id.*) Judge Snyder also instructed the jurors that they must weigh the credibility of Rozier's in-court identification of Pierce, and Rozier's testimony that the identification was based on his recollection of the event and his prior familiarity with Pierce. (*Id.* at 111–12.) Furthermore, Judge Snyder had previously instructed the jurors generally that they were "to determine the credibility or believability of various witnesses as well as the weight to be attached to the testimony," further instructing them that they, "alone, are the sole and exclusive judges of . . . the credibility of witnesses[] and the weight to be attached to the testimony of each witness." (*Id.* at 75.) Judge Snyder additionally

emphasized that Pierce claimed he was not present at the time of the crime and that the State bore the burden of proving beyond a reasonable doubt that he was present.  (*Id.* at 109.)

Thus, Pierce's argument is contradicted by the record.  Although Judge Snyder may not have employed the exact language that Pierce contends was required, the jury was nonetheless presented with the same substantive information.  Pierce provides no reason to believe that the jury instructions were so defective or prejudicial that the conviction resulting from their application violated Pierce's due process rights.  *See Kibbe*, 431 U.S. at 154.  As such, Pierce has failed to meet his burden of showing that the Appellate Division's affirmance of the conviction was contrary to, or an unreasonable application of, established federal law.[11]  Pierce has not identified in any way that the omission of the proposed instruction that he submitted deprived him of a federal right, nor has he pointed to a federal requirement that was violated by these jury instructions.

### ii.    Ground Seven – Jury Instruction on Attempted Murder

In Ground Seven, Pierce claims that Judge Snyder's instructions on attempted murder were defective in that they would have permitted the jury to reach a non-unanimous verdict. (ECF No. 1 at ECF pp. 45–47.)  Pierce contends that the instructions given to the jurors would have enabled them to convict him if some jurors believed that Pierce was guilty under one

---

[11]  The Court notes that, in 2011, the Supreme Court of New Jersey, in *State v. Henderson*, 27 A.3d 872 (N.J. 2011), held that the results of extensive scientific research concerning the reliability of eyewitness identifications required a change in the applicable framework applied to eyewitness identifications at trial and a correspondent revision of the relevant Criminal Model Jury Instructions.  *See id.* at 916–19, 924–26.  The Court premised this holding, however, on rights created by the New Jersey—not federal—constitution.  *Id.* at 919 n.10.  Furthermore, the holding in *Henderson* is prospective only; the Supreme Court made clear that it would not apply retroactively.  *Id.* at 926–28.  Thus, while Judge Snyder's instructions to Pierce's jury may not have contained the specific instructions regarding eyewitness identifications now recommended by the Criminal Model Jury Instructions, this does not create a defect that may be addressed before this Court.  *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991).

version of the attempt standard while other jurors believed Pierce was guilty under another. (*Id.*)
The relevant statute provides,

> A person is guilty of an attempt to commit a crime if, acting with
> the kind of culpability otherwise required for commission of the
> crime, he:
>
> (1) Purposely engages in conduct which would constitute the crime
> if the attendant circumstances were as a reasonable person would
> believe them to be;
>
> (2) When causing a particular result is an element of the crime,
> does or omits to do anything with the purpose of causing such
> result without further conduct on his part; or
>
> (3) Purposely does or omits to do anything which, under the
> circumstances as a reasonable person would believe them to be, is
> an act or omission constituting a substantial step in a course of
> conduct planned to culminate in his commission of the crime.

N.J.S.A. 2C:5-1(a). Pierce contends that the trial judge's instructions permitted the jurors to

convict him under either subparagraph (2) or (3) of that standard. (ECF No. 1 at ECF p. 47.)

In his instructions to the jury on attempted murder, Judge Snyder consistently invoked

subparagraph (2) of the attempt standard. (*See* ECF No. 19-48 at 84–87.) The Judge initially

stated that "the law provides that a person is guilty of an attempt to commit the crime of murder

if the person did do anything with the purpose of causing the death of the victim without further

conduct on his part," and shortly thereafter reiterated that "[t]he second element was that the

defendant did anything with the purpose of causing the death of the victim without further

conduct on his part." (*Id.* at 84–85.) After a detailed description of the purpose element, Judge

Snyder discussed the second element in greater detail:

> Secondarily, the State must also prove beyond a reasonable doubt
> that the defendant did anything with a purpose of causing the death
> of the victim without further conduct on his part. Now this means
> that the defendant did or -- did anything designed to accomplish
> the death of the victim without having to take further action.

> Where the defendant has done all that he believes necessary to
> cause the death of the victim, you should consider that as evidence
> of guilt of attempt to purposely cause the victim's death.

(*Id.* at 86–87.)

Pierce's allegations on this ground are entirely conclusory. While he quotes Judge Snyder's jury instructions at length and cites the relevant statute, he provides no substantive explanation of his theory that the jury could have understood the instructions to permit conviction under either of two theories. (*See* ECF No. 1 at ECF pp. 45–47.) In raising a jury-instruction claim, a habeas petitioner bears the burden of demonstrating not only that the instruction was erroneous, but also, that there was "'a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *McGuire*, 502 U.S. at 72 (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)). Here, the Court finds no likelihood that the jury understood the attempt instruction to mean that they could convict Pierce under either subparagraph (2) or (3) of the applicable standard. Indeed, Judge Snyder consistently laid out a standard that closely tracked subparagraph (2), instructing jurors that they must find beyond a reasonable doubt that Pierce "did anything with the purpose of causing the death of the victim without further conduct on his part." (*See, e.g.*, ECF No. 19-48 at 85.) At no point in the attempted-murder instructions did Judge Snyder suggest that a conviction could rest upon a finding that Pierce took a substantial step in a plan to commit the crime—the standard that would apply under subparagraph (3).

Accordingly, the Appellate Division was correct to find no merit to Pierce's challenge of the jury instructions. For the reasons stated above, the Court will therefore deny relief on Grounds Three, Six, and Seven.

### d. Ground Four – Verdict Against the Weight of the Evidence

Ground Four of the Petition raises another issue previously raised on direct appeal, namely that the jury's verdict was against of the weight of the evidence, largely because Rozier's testimony was allegedly "unreliable and uncorroborated."[12] (ECF No. 1 at ECF pp. 32–33). A habeas claim that the verdict was against the weight of the evidence implicates due process concerns. *See In re Winship*, 397 U.S. 358, 363–64 (1970); *see also Jackson v. Virginia*, 443 U.S. 307, 321 (1979). Habeas relief on this basis will be denied, however, so long as, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)). As required by AEDPA, the factual determinations of the state trial court are generally presumed to be correct. *See Werts v. Vaughn*, 228 F.3d 178, 196 (3d Cir. 2000).

At trial, Rozier testified that he had seen Pierce a few times over the four or five years preceding the shooting, that he shook hands with Pierce that night and spent about 45 minutes with a group of people including Pierce, that he saw Pierce draw a gun and shoot Merriel, and that he was facing Pierce when Pierce shot him. (*See* ECF No. 19-45 at 36–44, 57–62.) Rozier further testified that he knew who shot him, but did not initially know his name, and that he was positive that Pierce was the person who shot him. (*Id.* at 70, 72–73.) While Pierce's trial counsel presented testimony from Wallace, as an alibi witness, (ECF No. 19-46 at 52–58), and from two witnesses who stated that Pierce was not the shooter and was not present for the shooting, (*id.* at 72–99; Ans., Ex., Tr. of Trial (June 15, 2000), *State v. Pierce*, Docket No. 3008-09-98 (N.J. Super. Ct. Law Div., Camden Cty.), ECF No. 19-47, at 67–76), these credibility determinations were presented to the jurors. *See Kansas v. Ventris*, 556 U.S. 586, 594 n.* (2009)

---

[12] As noted above, portions of Ground Six also seem to invoke similar arguments that Pierce's conviction was against the weight of the evidence. (*See* ECF No. 1 at ECF pp. 43–45.)

("Our legal system . . . is built on the premise that it is the province of the jury to weigh the credibility of competing witnesses . . . ."). Although it is possible that some jurors could have found Pierce's defense witnesses' testimony to be more credible than Rozier's, viewing the record in the light most favorable to the prosecution, the Court finds no basis to conclude that no rational jury could have found Rozier's testimony credible and the defense witnesses to lack credibility. Indeed, because the jury could have found Rozier's testimony credible, that finding, along with other evidence, formed a sufficient basis for Pierce's conviction. *See Werts*, 228 F.3d at 196. In that regard, the Appellate Division did not misconstrue or misapply federal law in rejecting this argument upon review. As such, the Court will deny habeas relief on Ground Four.

### e. Ground Five – Ineffective Assistance of Counsel Claims

In Ground Five, Pierce raises multiple claims of ineffective assistance of counsel ("IAC"), which he previously raised in his first and second PCR proceedings.[13] (ECF No. 1 at ECF pp. 33–42.) The Sixth Amendment guarantees defendants effective assistance of counsel during critical portions of a criminal proceeding. *See Lafler v. Cooper*, 566 U.S. 156, 165 (2012). The Supreme Court, in *Strickland v. Washington,* 466 U.S. 668 (1984), articulated a two-prong burden for demonstrating the ineffectiveness of counsel: (1) that, considering all relevant circumstances, counsel's performance fell below an objective standard of reasonableness; and (2) that the petitioner suffered prejudice as a result. *Id.* at 687–96; *see also Preston v. Superintendent Graterford SCI*, ___ F.3d ___, 2018 WL 4212055, at *9, *12 (3d Cir. Sept. 5, 2018); *Grant v. Lockett,* 709 F.3d 224, 232 (3d Cir. 2013).

---

[13] The ineffective-assistance claim Pierce asserted in his second PCR proceeding directly concerned his first PCR counsel, but represented an attempt to raise otherwise defaulted arguments as to the ineffectiveness of his trial counsel. (*See* Ans., Ex., 2d Verified Pet., ECF No. 31.)

In addressing the first prong, the petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland,* 466 U.S. at 690. Judicial scrutiny of counsel's conduct must be "highly deferential." *See id.* at 689. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. The reviewing court must make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. Counsel's strategic choices made after thorough investigation of the relevant law and facts are "virtually unchallengeable," while choices made with less than entirely thorough investigation "are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91; *see also Rolan v. Vaughn,* 445 F.3d 671, 682 (3d Cir. 2006); *Gov't of V.I. v. Weatherwax,* 77 F.3d 1425, 1432 (3d Cir. 1996). Whether counsel acted in a manner that was deficient is measured by a standard of "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 687–88; *see also Wiggins v. Smith*, 539 U.S. 510, 521 (2003). Of course, in the context of a § 2254 habeas proceeding, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard." *Richter*, 562 U.S. at 101. The Court has thus characterized this review as "doubly deferential," as the Court must "take a highly deferential look at counsel's performance, through the deferential lens of § 2254(d)." *Pinholster*, 563 U.S. at 189 (internal quotation marks and citations omitted).

The second prong of the *Strickland* test requires the petitioner to affirmatively prove resulting prejudice. *See Strickland*, 466 U.S at 693. Prejudice is generally found where "there is

a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*; *see also McBride v. Superintendent, SCI Houtzdale,* 687 F.3d 92, 102 n.11 (3d Cir. 2012). "This does not require that counsel's actions more likely than not altered the outcome, but the difference between *Strickland's* prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable." *Richter,* 562 U.S. at 111–12 (internal quotation marks and citation omitted). Nevertheless, the Third Circuit has noted that this standard is "not stringent" and is "less demanding than the preponderance standard." *Branch v. Sweeney*, 758 F.3d 226, 238 (3d Cir. 2014) (internal quotation marks omitted).

### i. Failure to Advise Petitioner of his Right to Testify

Pierce first contends that Ali, his trial counsel, was ineffective by failing to adequately advise him concerning his right to testify, which resulted in losing the opportunity to do so. (*See* ECF No. 1 at ECF pp. 33–37.) Respondents contend that it is clear from the record that Pierce knew that he had a right to testify and understood that he could ultimately decide whether he would testify or not. (ECF No. 19 at 74–75.)

#### *(1)    Legal Framework*

A criminal defendant has a constitutional right to testify on his or her own behalf. *See generally Rock v. Arkansas*, 483 U.S. 44, 49–53 (1987). Indeed, the Supreme Court has observed that "the most important witness for the defense in many criminal cases is the defendant himself." *Id.* at 52. Defense counsel has a duty to inform a defendant of this right, but a defendant may nevertheless waive it so long as the decision to do so is "knowing and intelligent." *United States v. Pennycooke*, 65 F.3d 9, 11-13 (3d Cir. 1995). "'The *Strickland*

standard is applicable when a petitioner claims his attorney was ineffective by denying him his constitutional right to testify'"; it does not create the sort of structural defect that warrants automatic reversal. *Palmer v. Hendricks*, 592 F.3d 386, 394, 398 (3d Cir. 2010) (citation omitted) (quoting *Matylinsky v. Budge*, 577 F.3d 1083, 1097 (9th Cir. 2009)). Thus, here, to succeed on the claim that counsel's deficient representation violated his right to testify, Pierce must show both deficient performance and resulting prejudice. *See Ruiz v. Superintendent Huntingdon SCI*, 672 F. App'x 207, 210 (3d Cir. 2016), *cert. denied sub nom. Ruiz v. Tice*, 137 S. Ct. 1122 (2017).

Considering whether an attorney's failure to present potentially exculpatory evidence resulted in prejudice, "a reviewing court cannot merely determine whether there was sufficient evidence for a conviction at the time of trial, but instead must weigh the evidence as a whole and consider the potential impact of the previously unpresented evidence." *Ruiz*, 672 F. App'x at 210; *see also Saranchak v. Sec'y, Pa. Dep't of Corr.*, 802 F.3d 579, 599–600 (3d Cir. 2015), *cert. denied sub nom. Saranchak v. Wetzel*, 136 S. Ct. 1494 (2016). The proper examination "focuses on the effect the same evidence would have had on an unspecified, objective factfinder rather than a particular decisionmaker in the case." *Saranchak*, 802 F.3d at 588; *see also Ruiz*, 672 F. App'x at 210. The central question is "whether the state courts unreasonably concluded that there was not a substantial likelihood that [the omitted exculpatory evidence] would have change the outcome of [the] trial." *Branch*, 758 F.3d at 238.

### (2)    The Record on PCR Appeal

The record supports Pierce's claims that Ali denied or interfered with his right to testify. At trial, after both sides had rested and the jury had been released for the day, the trial judge discussed with Pierce his preference regarding the charge to be given when a defendant elects

not to testify, stating "Mr. Pierce, now you have not chosen to testify, that's okay. I take it you want me to give the jury the instruction, do you not? Remember what the instruction was? Let me read it to you." (ECF No. 19-47 at 152.) Pierce responded, "Yeah. Read me that." (*Id.*) After reading the charge, the judge continued the discussion:

> THE COURT: Do you understand that charge?
> THE DEFENDANT: Yes.
> THE COURT: Again, do you want to speak to counsel, confer before you answer the question?
> THE DEFENDANT: No.
> THE COURT: You want me to give that charge?
> THE DEFENDANT: Well --
> THE COURT: Counsel, you want to assist him?
> MS. ALI: Your Honor, Mr. Pierce has made it known to me he wants to speak to you regarding the procedures, what has happened during the case and I had said I would so appraise [sic] you of his opportunity to speak.
> MS. PINETTE: Can we address the question the Court's asking right now first?
> THE COURT: I want him to answer the question. Do you want that instruction?
> MS. ALI: Yes.
> THE COURT: I'm asking him too.
> THE DEFENDANT: What I wanted you to do was go over, cause I was considering testifying.
> THE COURT: Too late now.
> THE DEFENDANT: I was trying to get to you earlier.
> THE COURT: I want you to understand something. I don't have a right to ask you, are you going to testify. I assume --
> THE DEFENDANT: That's my option, right? I wanted to know -- I had forgot some of the things the prosecutor had said she was going -- wouldn't put in as far as concerning my record, convictions, you understand what I'm saying?
> THE COURT: I think I understand what you're saying.
> THE DEFENDANT: If I did testify, what was she going to withhold?
> THE COURT: We talked about that.
> THE DEFENDANT: It's too late now.
> THE COURT: What would have happened is we said there was a weapons charge, I think it was a black jack or something.
> THE DEFENDANT: A robbery.
> THE COURT: That was not going to be used by the State to cross-examine you. They had already said that at the beginning

of your presence [sic] so you knew if you testified the rest of the convictions were likely to be used but the black jack was not and that's what I understood because robberies did not involve any type of dangerous weapon, handgun or anything of that nature. So --

    THE DEFENDANT: It's too late.
    THE COURT: Why, sure, because the State --
    THE DEFENDANT: That's it?
    THE COURT: But the question is now you want the charge, right?
    THE DEFENDANT: Yes.
    THE COURT: Okay.

(*Id.* at 152–55.)

Pierce, in a supplemental brief filed by his PCR counsel, Edward J. Crisonino ("Crisonino"), in support of his first PCR petition, alleged that Ali failed to advise him of his right to testify. (Ans., Ex., Br. in Supp., ECF No. 19-17, at 8–9.) He alleged Ali "did not discuss the [right] to testify and what could be used to cross-examine him from his prior criminal record" and that he would have testified, had he been advised of his right to do so. (*Id.*) Pierce also submitted an affidavit to the PCR court, in which he stated,

1. From the first day of trial I made attorney Irene Ali aware that I wanted to testify on my behalf.
2. At which time attorney Irene Ali stated we had time to talk about me testifying.
3. As the trial went on I mentioned it again and asked how my record would be used when I testified.
4. Because my concern was to allow the jury to know I have no violence in my past. So, I was looking forward to testifying.
5. Attorney Irene Ali again stated we had time and said she needed to check on witnesses and make some calls concerning witnesses.
6. Attorney Irene Ali never addressed my desire to testify after several requests.
7. When I finally got the opportunity to talk to Judge Snyder concerning testifying. Judge Snyder stated, "It was too late!"

(Ans., Ex., Aff. of Louis Pierce, ECF No. 19-19.)

Although Pierce raised a number of claims on PCR, the PCR motion hearing focused

primarily on the testimonial-election issue.  (*See* ECF No. 19-50 at 5–21.)  Counsel for the State

argued that Pierce had nine prior convictions, several of which included time spent in state

prison, and stated as follows:

> So the defendant would have been presenting testimony but he
> would have also been exposing this prior record to the jury at his
> trial.  So it would make sense that the defendant would not have
> wanted to testify in a case like this. The facts that the defendant
> would have wanted to bring out would have been -- I would
> assume in support of the alibi. There is nothing in the affidavit that
> he's presented to the Court indicating what exactly it was he
> wanted to testify to.  I would only assume that it would be
> consistent with the alibi that came out through his girlfriend,
> nothing to show that there would be any testimony beyond that.

(*Id.* at 9–10.)  The State also asserted that Wallace's testimony as to Pierce's alibi was

"successfully rebutted" and suggested that Pierce would risk presenting conflicting testimony if

he did not testify consistently with Wallace.  (*Id.* at 10.)  Crisonino argued that the State's theory

amounted to speculation, and that Pierce's statements in the trial record coupled with his

affidavit showed that Pierce intended to testify.  (*Id.* at 5, 15–16.)

The PCR court asked the State whether there was a colloquy between the trial court and

Pierce regarding testimonial election prior to Pierce's statements at the charging conference.[14]

(*Id.* at 12.)  The State acknowledged that a colloquy regarding testimonial election would

normally take place at the close of the State's case, but the parties and the court, upon reviewing

the trial transcript, determined that no such colloquy had taken place.  (*Id.* at 13–14.)  Counsel

for the State argued, however, that the lack of record regarding testimonial election suggested a

trial strategy whereby Pierce would not testify.  (*Id.* at 14–15.)

The PCR court and Crisonino also had the following exchange regarding the sufficiency

---

[14]  Judge Snyder, who presided over Pierce's trial, did not hear Pierce's PCR motion, which was
instead heard by Judge Frederick J. Schuck.  (*See* ECF No. 19-50 at 1.)

of Pierce's Affidavit:

> THE COURT: He [Pierce] doesn't say anything in his
> affidavit about what the substance of his testimony would be or
> how that might help his defense in any way, in the affidavit you
> submitted on behalf of your client recently.
> MR. CRISONINO: Well, Your Honor -- yes, Your Honor,
> and as the prosecutor indicated he would bolster the alibi given by
> his girlfriend, essentially.

(*Id.* at 19.) The PCR court began to ask another question, but then reverted to another topic,

stating, "let me back up a half step before I get into that," and returning to the issue of whether or

when Pierce should have notified the trial court that he wanted to testify. (*See id.* at 19–20.)

Without any further discussion, however, the PCR court recounted the arguments and

proceeded to rule upon the petition. (*See id.* at 21–25.) Addressing this claim, the PCR court

noted that

> [w]ith the initial submissions of the defendant in this case, I note
> that there were no affidavits setting forth how things would have
> been different if the evidence that he talks about that was not
> properly addressed or investigated would have helped his case.
> How -- what evidence there would be that he would have utilized
> to his benefit and specifically with respect to his own testimony,
> what the essence of it would be or how it would help him.

(*Id.* at 25.) The PCR court further observed that, after the initial filings, Pierce had submitted an

affidavit, but that "beyond the generalized statement of the defendant in his affidavit where he

talks about how he would liked [sic] to have testified or wanted to testify, there's nothing here

that says what the testimony would have been or how it would have helped him." (*Id.* at 26.)

The PCR court noted that testimony from Marla Wallace had been admitted "purporting to serve

as an alibi," but that "[t]hat alibi had already faced rebuttal evidence from the State relative to

news reports pertaining to this case that tended to cut against that." (*Id.*) The PCR court found,

> Even if we assume for the purposes of argument that he was -- said
> that he was elsewhere, all that's in the face of, as I just said, the

> fact that it would have been cumulative of the other testimony
> from his girlfriend that said the same thing, it would have had to
> face all of the evidence concerning his prior convictions, which he
> says in his affidavits was a subject that he had already talked about
> and considered and was aware of and it would have come in the
> face of the overwhelming evidence from the State, eyewitness
> evidence, including that of one of the victims, Mike Rozier, who
> said that he was absolutely certain or words to that effect that this
> defendant was the trigger man and that he knew the defendant
> generally from the streets and that this was clearly him.

(*Id.* at 26–27 (reporter's parenthetical omitted).)  The PCR court concluded that, even had Pierce

demonstrated deficient representation by counsel, he had failed to show prejudice, and thus had

"not made a *prima facie* showing as to that as a respect to [sic] his right to testify and the

arguable failure of his counsel to discuss that with him."  (*Id.* at 27.)  Accordingly, the PCR court

declined to hold a hearing on the matter and denied Pierce's petition.  (*Id.* at 31–32; Ans., Ex.,

Order Denying PCR (Sept. 10, 2007), *State v. Pierce*, Indict. No. 3008-09-98 (N.J. Super. Ct.

Law Div., Camden Cty.), ECF No. 19-20.)

### (3)     The PCR Appellate Decision

On appeal of that denial, Pierce's counsel argued that he "at least established a prima

facie claim of ineffectiveness and an evidentiary hearing is required for testimony from his trial

attorney regarding this claim."  (Ans., Ex., Br. & App'x, ECF No. 19-22, at 4.)  Counsel further

argued that, "[b]ecause [Pierce's] claim must be fleshed out with evidence outside of the record,

namely, his testimony and the testimony of his trial attorney, this case must be remanded for an

evidentiary hearing."  (*Id.* at 10.)

In affirming the denial of Pierce's claim, the Appellate Division reviewed the PCR

court's treatment of the claim, set out the *Strickland* standard, and determined that Pierce failed

to meet the prejudice prong of *Strickland*, and thus failed to make a *prima facie* case of

ineffective assistance counsel:

In his affidavit submitted as part of his PCR petition, defendant averred that he informed trial counsel at the start of and continuously throughout trial that he wanted to testify. Defendant claimed trial counsel said they had time to talk about him testifying but "never addressed [his] desire to testify after several requests." He also stated that when he "finally got the opportunity to talk to Judge Snyder concerning testifying[,] Judge Snyder stated, 'It was too late!'"

The PCR judge noted the trial judge's discussions regarding defendant's right to testify. He also noted that there were no affidavits setting forth how things would have been different. The judge pointed out that if defendant had testified, his nine prior convictions would have been brought to the jury's attention. The judge characterized any potential testimony about an alibi as cumulative, and this and all his other assertions "would have come in the face of the overwhelming evidence from the State," including Rozier's testimony. The judge thus determined that, even if the first prong of Strickland were satisfied, the prejudice prong had not been met, and defendant had not made a prima facie showing.

In the interest of brevity, we will assume that trial counsel was ineffective in failing to counsel defendant about his right to testify. *State v. Bey*, 161 *N.J.* 233, 270–71 (1999), *cert. denied,* 530 *U.S.* 1245, 120 *S. Ct.* 2693, 147 *L. Ed.* 2d 964 (2000). In the context of a PCR petition alleging ineffective assistance of counsel due to an alleged failure of counsel to inform a defendant of his right to testify, the Supreme Court has found that

> "it is the responsibility of a defendant's counsel, not the trial court, to advise defendant on whether or not to testify and to explain the tactical advantages or disadvantages [of] doing so or not doing so." *State v. Bogus*, 223 *N.J. Super.* 409, 423 [(App. Div.), *certif. denied*, 111 *N.J.* 567 (1988)]. Counsel's responsibility includes advising a defendant of the benefits inherent in exercising that right and the consequences inherent in waiving it. To ensure that counsel meets that obligation, it may be the better practice for a trial court to inquire of counsel whether he or she had advised a defendant . . . of his or her right to testify. This will best ensure that defendant's constitutional rights are fully protected. Indeed, counsel's failure to do so will give rise to a claim of ineffectiveness of counsel.
>
> [*State v. Savage*, 120 *N.J.* 594, 630–31 (1990).]

Determining whether counsel's performance prejudiced the defendant under the second prong can be accomplished by examining the record of previous proceedings. *Bey*, *supra*, 161 *N.J.* at 273–75 (finding counsel's performance did not prejudice the defendant and the defendant was aware of his right to testify after examination of trial record, including colloquy among the court, the defendant, and defense counsel in which the court asked the defendant and defense counsel about jury charges on the right to remain silent).

Here, as in *Bey*, defendant cannot satisfy prong two of the *Strickland* test, which we may examine first. *Strickland*, *supra*, 466 *U.S.* at 697, 104 *S. Ct.* at 2069, 80 *L. Ed.* 2d at 699. Defendant argues in essence that he was denied a constitutional right when counsel did not advise him of his right to testify, and this failure in and of itself prejudiced him. This argument is insufficient under *Strickland* because defendant fails to show how this equates to a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, *supra*, 466 *U.S.* at 694, 104 *S. Ct.* at 2068, 80 *L. Ed.* 2d at 698.

Defendant has further failed to demonstrate that counsel's error is "so serious as to undermine the court's confidence in the jury's verdict or the result reached." *Chew*, *supra*, 179 *N.J.* at 204. This is especially true because defendant has failed to specify what he would have said in his testimony. We need not engage in speculation as to the nature of defendant's testimony, as he had the burden to establish that the result of the proceeding would have been different had he testified. Obviously, no evidentiary hearing was required where he failed to make out a prima facie case in this regard.

(ECF No. 19-25 at 15–18 (alterations in original).)

### (4)     *Analysis of the PCR Appellate Decision*

It is somewhat unclear whether the Appellate Division here simply adopted the analysis of the PCR court, in which case this Court must look through to the PCR court's decision and assess that reasoning, *see Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018), or if the Appellate Division's decision was based entirely on the finding that Pierce did not meet his burden under *Strickland* because he "failed to specify what he would have said in his testimony." Assuming

that the Appellate Division decision in this context adopted the PCR court's reasoning, this Court finds that the decision was premised on an unreasonable application of *Strickland* precedent and an unreasonable determination of the facts, under 28 U.S.C. § 2254(d)(1) and (2). The PCR court found no prejudice under *Strickland* for four distinct reasons: (1) that Pierce had not sufficiently shown how he would have testified at trial; (2) that if Pierce had testified "that he was elsewhere," such testimony would have been cumulative of Wallace's; (3) that Pierce's testimony "would have had to face all of the evidence of his prior convictions"; and (4) that such testimony "would have come in the face of the overwhelming evidence from the State." (ECF No. 19-50 at 26–27.) I will address each, in turn.

First, although, in his PCR filings, Pierce could have supported his claim with additional explanations of what his testimony would have been, there is no dispute that Pierce's PCR counsel, Crisonino, counsel for the State, and the PCR court all recognized that Pierce would have testified regarding his own alibi, which testimony would have corroborated Wallace's testimony.[15] (*See* ECF No. 19-50 at 10, 19, 26.) Indeed, while the PCR court suggested that it would further explore the question of how Pierce would have testified, the court nevertheless did not substantively address it. (*See id.* at 19–20.) Ultimately, the court declined to hold an evidentiary hearing, during which Pierce presumably could have explained how he would have testified at trial. (*Id.* at 32.) Nevertheless, the PCR court was clearly cognizant of Pierce's position that he would have testified to bolster his alibi defense.

In recognizing this, the PCR court concluded that Pierce's testimony would have been cumulative of Wallace's—concluding that the omission of such testimony could not have been

---

[15]  As discussed further below, Wallace testified that Pierce was in bed with her when she heard a news report about the shooting at 5:30 a.m. on the morning after the incident occurred and that it was typical for Pierce to meet her in Camden after she got off work and to return to their home in Philadelphia at 8:30 p.m. (*See* ECF No. 19-46 at 53–61.)

prejudicial under *Strickland*.[16]  (*Id.* at 26–27.)  The Court finds this conclusion to be unreasonable—fair-minded jurists could not disagree that Pierce's testimony as to his own alibi could not be considered cumulative and that its exclusion was prejudicial.

At trial, the only testimony as to Pierce's alibi was presented by Wallace, who testified that she recalled hearing about the shooting of Rozier and Merriel on a 5:30 a.m. news broadcast and that Pierce was in bed with her when she heard the report.  (ECF No. 19-46 at 53–54, 56–57.)  On cross examination, Wallace testified that she was not sure what day she heard this report, but acknowledged that the phrasing of the report implied that the shooting had occurred the "night before or the very same morning."  (*Id.* at 60–61.)  Wallace additionally testified that it was the normal practice for Pierce to meet Wallace at her mother's house, in Camden, at 5:30 each evening, stay there until 8:30 p.m., and then for the two of them to return to their home in Philadelphia.  (*Id.* at 55–57.)  In an effort to discredit Wallace's testimony, the State presented testimony from an employee of the television station WPVI TV Channel Six, who averred that its "Action News" program did not report on the shooting of Rozier and Merriel until 5:00 p.m. on November 6, 1996.  (ECF No. 19-47 at 19–24.)  The State also elicited testimony from a prosecutor's office investigator, Bruce Gilbert ("Gilbert"), who stated that he spoke with Wallace in the courthouse before she testified and that she had told him that she heard a news broadcast "in reference to this case" on Channel Six Action News at 5:30 a.m.  (*Id.* at 28–30.)

While it is constitutionally permissible to exclude evidence that is "repetitive" or "only marginally relevant," *see, e.g.*, *Holmes v. South Carolina*, 547 U.S. 319, 326–27 (2006), here, the

---

[16]  The Court notes that the question of whether certain evidence would have been cumulative arises most frequently when determining whether the omission of that evidence was harmless in the context of claimed trial error.  *See generally Brecht v. Abrahamson*, 507 U.S. 619 (1993); *Chapman v. California*, 386 U.S. 18 (1967).  The Court observes, however, that "for a federal court on habeas review, the harmless inquiry under *Brecht* is coextensive with *Strickland's* prejudice inquiry."  *Howard v. Horn*, 56 F. Supp. 3d 709, 732 (E.D. Pa. 2014).

only support for Pierce's alibi—the central and crucial issue on Pierce's defense—came from

one witness, whose credibility was challenged by rebuttal testimony.  As numerous courts have

observed, "[e]vidence is cumulative when it supports a fact established by existing evidence,"

and evidence supporting a central issue that is not strongly corroborated or otherwise remains in

doubt cannot reasonably be labeled cumulative.  *Washington v. Smith*, 219 F.3d 620, 634 (7th

Cir. 2000) (internal quotation marks omitted) ("The fact that Pickens had already testified to

facts consistent with Washington's alibi did not render additional testimony cumulative."); *see

also United States v. Bellinger*, 652 F. App'x 143, 150 (4th Cir. 2016) (finding that "testimony

that would have added a great deal of substance and credibility to a proffered defense is not

cumulative" and that "we will not assume the sole third-party corroboration of a detail central to

Appellant's self-defense argument would not have added a great deal of substance and credibility

to his defense" (internal quotation marks and ellipsis omitted)); *Mosley v. Atchison*, 689 F.3d

838, 848 (7th Cir. 2012) ("Evidence that provides corroborating support to one side's sole

witness on a central and hotly contested factual issue cannot reasonably be described as

cumulative."); *English v. Romanowski*, 602 F.3d 714, 726–27 (6th Cir. 2010) ("Undoubtedly, the

testimony of a second person to corroborate the Defendant's version of the events would not

have been cumulative, but rather could have critically added to the strength of the defense's

case."); *United States v. Stevens*, 277 F. App'x 898, 900 (11th Cir. 2008) ("[T]he prior

convictions were not cumulative, because . . . there were credibility questions about the

testimony of the two eyewitnesses in this case . . . [and] [t]he prior convictions were an important

component of the Government's case . . . ."); *Vasquez v. Jones*, 496 F.3d 564, 576 (6th Cir.

2007) ("The mere fact that one other witness has testified to a particular fact does not render

other testimony on that point 'cumulative.'" (internal parentheticals omitted)); *Stapleton v.

*Wolfe*, 288 F.3d 863, 868 (6th Cir. 2002) (finding that state appellate court's conclusion that corroborating statements were cumulative "runs contrary to federal law clearly established by the Supreme Court[]"); *Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 829 (10th Cir. 1995) ("Cumulative evidence is defined as evidence which goes to prove what has already been established by other evidence." (internal quotation marks omitted)). Given that Pierce's potential testimony would have supported his own alibi and innocence, it was not "marginally relevant," and as the credibility of the only testimony in support of his alibi had been called into question, his testimony would be more accurately termed corroborative than repetitive. Under these circumstances, no fair-minded jurist could disagree that it was improper to dismiss as cumulative the defendant's own potential testimony as to his alibi. *See Washington*, 219 F.3d at 633–34.

The PCR court's analysis also mischaracterized the circumstances surrounding Pierce's trial. First, the PCR court stated that, if admitted, Pierce's testimony "would have had to face all of the evidence concerning his prior convictions." (ECF No. 19-50 at 26–27.) This finding is not supported by the record, particularly since the trial court never concluded its *Sands* hearing,[17] and therefore, there was no finding as to which of Pierce's prior convictions would have been admitted. (*See* ECF No. 19-44 at 13–17.) Indeed, without any analysis, the PCR court's finding incorrectly assumed that Pierce's prior convictions, collectively, would have been admitted and that those convictions would be so prejudicial such that the jury would not find Pierce's testimony credible. This conclusion is entirely unsupported. Indeed, Judge Snyder's comments

---

[17] Under *State v. Sands*, 386 A.2d 378 (N.J. 1978), a New Jersey trial judge may hold a hearing regarding the admissibility of a criminal defendant's prior convictions and "shall admit evidence of criminal convictions to affect credibility of a criminal defendant unless in his discretion he finds that its probative force because of its remoteness, giving due consideration to relevant circumstances such as the nature of the crime, and intervening incarcerations and convictions, is substantially outweighed so that its admission will create undue prejudice." *Id.* at 387–88.

during the charge conference suggest that he would have excluded at least Pierce's prior convictions for robbery and possession of a blackjack. (*See* ECF No. 19-47 at 154.)

Furthermore, when weighing the potential impact of Pierce's omitted testimony, the PCR court stated that the testimony "would have come in the face of the overwhelming evidence from the State," (ECF No. 19-50 at 27), a statement repeated by the Appellate Division on review, (ECF No. 19-25 at 16). This grossly overstates the State's evidence against Pierce, as the only direct inculpatory evidence was Rozier's testimony. There was no physical or forensic evidence implicating Pierce, and no other witnesses had identified Pierce as the shooter—indeed, two eyewitnesses contradicted the claim that Pierce was the shooter. (*See* ECF No. 19-46 at 74–75; ECF No. 19-47 at 76, 131–38.) Also compelling is that the accuracy of Rozier's testimony was brought into question by the fact that he did not identify Pierce until a year after the shooting, (ECF No. 19-45 at 50–55, 70–71), and by eyewitness testimony that Rozier had been consuming alcohol and using cocaine on the night of the shooting, which could have impaired his perceptions, (ECF No. 19-46 at 74, 80–81, 100–03). In that regard, although the Court is cognizant that the purpose of this petition is not to weigh the trial evidence in light of the verdict, the inquiry, here, is whether no fair-minded jurist could disagree that the PCR court unreasonably applied *Strickland* or made an unreasonable determination of the facts in concluding that Pierce failed to show a reasonable probability of a different outcome had he been able to exercise his right to testify; and I so find. Accordingly, if the Appellate Division's decision was premised upon an adoption of the PCR court's analysis, such decision represented an unreasonable application of *Strickland* and an unreasonable determination of the facts, under 28 U.S.C. § 2254(d)(1) and (2).

Similarly, even if the Appellate Division performed an independent analysis, the same result obtains. The Appellate Division stated that "Defendant argues in essence that he was denied a constitutional right to testify, and this failure in and of itself prejudiced him." (ECF No. 19-25 at 17–18.) The appellate court then characterized this argument as insufficient because it did not establish prejudice under *Strickland*. (*Id.*) This analysis, however, arises from an erroneous premise, as Pierce's Sixth Amendment argument cannot reasonably be construed as asserting that prejudice arose from the deprivation of his right to testify "*in and of itself*." Rather, as reflected in the record on appeal, Pierce and the State argued before the PCR court as to whether the omission of his testimony would in fact have caused him prejudice—not whether it could be considered a structural error. (ECF No. 19-50 at 9–10, 19–20.) Indeed, the PCR court specifically questioned Pierce's counsel as to "what the substance of his testimony would be or how that might help his defense in any way," and Pierce's counsel responded that Pierce's testimony "would bolster the alibi given by his girlfriend." (*Id.* at 19.) As discussed above, the PCR court rejected Pierce's claim on the basis that his testimony would have been cumulative in the face of overwhelming evidence implicating Pierce,[18] and, therefore, the court found that the exclusion of his testimony was nonprejudicial, not that Pierce had failed to establish a structural error. (*Id.* at 26–27.)

Further, the Appellate Division, in concluding that Pierce had not met his burden before the PCR court, also noted that Pierce "has failed to specify what he would have said in his testimony" and that it "need not engage in speculation as to the nature of defendant's testimony." (ECF No. 19-25 at 18.) The record, however, shows that Pierce's counsel represented that Pierce

---

[18] As discussed above, however, the PCR court's characterization of the evidence against Pierce as "overwhelming" is a gross exaggeration, and its conclusion that Pierce's testimony would have been cumulative is legally untenable.

would have bolstered Wallace's testimony and that the PCR court and the State understood that this was the manner in which he would have testified. (ECF No. 19-50 at 9, 19, 26–7.) The Appellate Division of course also had before it Wallace's trial testimony in support of Pierce's alibi. (ECF No. 19-46 at 52–61.) Thus, the Appellate Division had no need to speculate, as the nature of Pierce's proposed testimony was clear from the record.

Furthermore, the Appellate Division appears to have misconstrued the burden that Pierce bore, finding that, to prevail on his ineffective assistance claim, Pierce had "the burden to establish that the results of the proceeding *would have been different* had he testified." (ECF No. 19-25 at 18 (emphasis added).) This standard misrepresents the *Strickland* prejudice prong, which test requires showing only a "reasonable probability" that, but for deficient representation, the result in the case would have been different and that a "reasonable probability" need only be a "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S at 694. The Appellate Division had seemingly recounted the correct standard elsewhere in its Opinion; clearly, however, the court applied a more stringent standard when determining Pierce had failed to meet the prejudice prong. (*See* ECF No. 19-25 at 18.) Indeed, Pierce needed only to allege a *prima facie Strickland* claim to avoid preliminary denial of his claim by the PCR trial court. Thus, having examined the record on appeal, I find that the Appellate Division disregarded the proceedings before the PCR court, misconstrued Pierce's arguments, and unreasonably heightened the *Strickland* burden of proof in denying Pierce's claim for ineffective assistance of counsel.

Indeed, whether the Appellate Division is considered to have adopted the PCR court's reasoning or to have conducted its own analysis, no reasonable jurist could have concluded that Pierce's own testimony as to his alibi would not have materially aided his case. His counsel had

represented, and the PCR court and the State agreed, that Pierce would have testified consistent with Wallace, thus bolstering his otherwise uncorroborated alibi. As noted above, the evidence against Pierce was otherwise slim, relying entirely on the testimony and belated identification of Pierce by one of the victims, which testimony was contradicted by other eyewitnesses. Given these weaknesses in the State's case and the fact that Pierce's own testimony would have bolstered his alibi defense, the Court finds that no fair-minded jurist would disagree that there exists a reasonable probability—that is, a probability sufficient to undermine confidence in the outcome—that the inclusion of Pierce's testimony as to his alibi would have altered the jury verdict. *See Branch*, 758 F.3d at 238–41. Accordingly, the Appellate Division's decision represents an unreasonable application of *Strickland* and an unreasonable determination of the facts under § 2254(d)(1) and (2). As such, § 2254(d)(1) and (2) do not bar an award of relief on Pierce's petition.

*(5)* De Novo *Review*

Having determined that the Appellate Division unreasonably applied *Strickland*, the Court now considers this claim on a *de novo* basis. *See Branch*, 758 F.3d at 242; *Simmons v. Beard*, 590 F.3d 223, 231 (3d Cir. 2009). For the reasons already provided, the factual record from the state proceedings as to the sufficiency of Pierce's representation is underdeveloped, which leaves various questions outstanding. While section 2254(e)(2) precludes a district court from holding an evidentiary hearing when "the applicant has failed to develop the factual basis of a claim in State court proceedings," 28 U.S.C. § 2254(e)(2), where a petitioner unsuccessfully sought an evidentiary hearing and unsuccessfully appealed the denial of his PCR petition, the failure to develop the factual record does not lie with the petitioner. *Branch*, 758 F.3d at 241; *Thomas v. Varner*, 428 F.3d 491, 498 (3d Cir. 2005).

Here, Pierce sought from the PCR court a hearing on his claims, including the claim that trial counsel Ali was deficient by failing to adequately advise Pierce concerning his right to testify and that this deficiency prejudiced him; however, the PCR court declined to hold such a hearing and the Appellate Division affirmed this decision. As factual questions remain regarding Pierce's *Strickland* claim, and as Pierce does not bear the responsibility for the failure to develop these facts, I found that an evidentiary hearing before this Court was justified. *See Branch*, 758 F.3d at 242; *Thomas*, 428 F.3d at 498–501. Accordingly, I held an evidentiary hearing concerning this claim on February 9, 2018, and subsequently accepted supplemental briefing from the parties. (*See* ECF Nos. 35–38.) At the evidentiary hearing, the Court heard testimony from Pierce concerning, among other topics, his interactions with Ali during trial and how he would have testified had he taken the stand at trial. (*See* ECF No. 35.) While the Court had previously noted that it expected to hear testimony from Ali, (ECF No. 25), Pierce's counsel represented that Ali was unable to speak with them or to testify at the hearing as she had moved out of state and suffered various medical issues, (*see* Letter from John S. Stapleton (Jan. 22, 2018), ECF No. 31). Respondents stipulated to Ali's unavailability. (ECF No. 35 at 4–5.)

The first prong of *Strickland*, of course, requires a showing that the litigant's counsel provided deficient representation. *See Strickland*, 466 U.S. at 687–91. While the state courts proceeded on the assumption that Ali's representation was deficient, neither court conducted a substantive analysis of this prong, and this Court will thus examine the issue. (*See* ECF No. 19-25 at 16–17; ECF No. 19-50 at 27.) In that regard, Pierce maintains that the state courts were correct in assuming that Ali's representation was deficient. (Post-Hr'g Br. in Supp., ECF No. 36, at 24–27.) Respondents argue that the trial record indicates that Pierce knew of his right to testify, yet failed to raise that issue himself. (Resp'ts' Post-Hr'g Br., ECF No. 37, at 11–16.)

Generally, where counsel has allegedly provided deficient representation by failing to present important exculpatory witnesses, the court must "affirmatively entertain the range of possible reasons petitioner's counsel may have had for proceeding as he did." *Branch*, 758 F.3d at 235 (internal quotation marks and alterations omitted). Nevertheless, the court also must consider the critical importance of a criminal defendant's constitutional right to testify. *Rock*, 483 U.S. at 51 (noting that a defendant's right to testify is "one of the rights that 'are essential to due process of law in a fair adversary process'" (quoting *Faretta v. California*, 422 U.S. 806, 819 n.15 (1975))); *see also Harris v. New York*, 401 U.S. 222, 230 (1971) ("Every criminal defendant is privileged to testify in his own defense, or to refuse to do so."). With respect to that consideration, the court must bear in mind that the right to testify is personal to the defendant, and only the defendant may choose to waive it. *United States v. Leggett*, 162 F.3d 237, 245 (3d Cir. 1998); *Pennycooke*, 65 F.3d at 10–11; *see also Jones v. Barnes*, 463 U.S. 745, 751 (1983); *Ortega v. O'Leary*, 843 F.2d 258, 261 (7th Cir. 1988). To that end, a defendant's decision to waive the right to testify must be knowing and intelligent, but the trial court has no duty under the United States Constitution to explain this right to the defendant or to confirm that any such waiver is voluntary. *Leggett*, 162 F.3d at 246; *Pennycooke*, 65 F.3d at 11; *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 241–42 (1973). Instead, "[t]he duty of providing such advice and ensuring that any waiver [of the right to testify] is knowing and intelligent rests with defense counsel." *Pennycooke*, 65 F.3d at 13; *see also Leggett*, 162 F.3d at 247.

Pursuant to the affidavit Pierce submitted in support of his PCR petition, Pierce informed his counsel, Ali, that he wished to testify and that Ali repeatedly delayed or avoided the discussion, until she rested for the defense without presenting Pierce's testimony. (*See* ECF No. 19-19.) Pierce's testimony at the evidentiary hearing before this Court is consistent with these

prior representations. Pierce testified that during his first meeting with Ali he told her he was not guilty and indicated his desire to testify. (Tr. of Evid. Hr'g (Feb. 9, 2018), ECF No. 35 at 9, 49.) Pierce also testified that he repeated his desire to testify in conversations with Ali during the course of the trial, and that he asked Ali when the trial judge would determine the admissibility of his prior convictions should he testify. (*Id.* at 13–14.) Despite these requests to his attorney, Pierce indicated that Ali never took any steps to ensure that Pierce could exercise his right to testify, but rather, Ali "continued to say that [they] had time and [they will] get back -- that she would get back to [Pierce] on that." (*Id.* at 14–15.) Pierce stated that Ali never advised him "that this is your last chance to make a decision to testify" or corrected Pierce's mistaken belief that the *Sands* hearing would, at some point, be concluded. (*Id.* at 15.) When asked if Ali advised Pierce "that the decision to testify was [his] and was [his] alone, and that even if she disagreed with [Pierce], [Pierce] still had a right to testify," Pierce responded: "We never spoke about that." (*Id.* at 15.) Accordingly, Pierce testified that he did not waive his right to testify knowingly, intelligently, or voluntarily. (*Id.* at 15–16.) In that connection, Pierce explained that he believed that Ali would inform the trial court on his election to testify and that he was waiting for her to do so. (*Id.* at 16, 51.)

Pierce further testified that Ali did not confer with him before resting the defense case and that he did not then understand, procedurally, what that meant. (*Id.* at 16–17.) Pierce explained that he wanted to speak directly to Judge Snyder during the charge conference to convey his desire to testify. (*Id.* at 20–21.) And, Pierce was under the impression that the decision on the admissibility of his prior convictions was still outstanding; but, in any event, Pierce testified that he would have taken the stand even if all prior convictions were to be admitted. (*Id.* at 20–22.)

Respondents argue that Pierce was informed of, and clearly knew that, it was his right to testify and his choice to make. (ECF No. 19 at 74–75.) They contend that Pierce was actively engaged in the litigation and should have realized that Ali was not planning to present his testimony. (*Id.* at 75–79.) Respondents essentially argue that Pierce's claim that he wanted to testify all along is belied by the fact that he had opportunities to raise this issue with Judge Snyder but failed to do so. (*See id.* at 79, 81–82.) Respondents reason that because Pierce did not contradict Judge Snyder when the judge referenced Pierce's decision not to testify, Pierce "had in fact made a decision *not* to testify." (*Id.* at 83.) In their supplemental briefing, Respondents argue that there can be no finding of deficient representation

> [w]here Petitioner knew it was his right, was vocal and unaccepting of assistance from counsel, never actually told the court that he had decided to testify, did not correct counsel's representation that there were no further witnesses, did not contradict the court's report that Petitioner had in fact decided not to testify, and somehow failed to raise this grievous violation throughout seven years of active *pro se* filings and in-court appearances.

(ECF No. 37 at 12.)

Respondents erroneously focus on the inquiry of what Pierce might have known or done in the context of the deficiency prong of *Strickland*. More appropriately, however, the relevant question here is whether "*counsel's* performance fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88 (emphasis added). There is no dispute that Pierce knew of his general right to testify in his own defense and that he did not take any independent action before the trial court to enforce that right until after the evidence in the case had been closed. The constitutional question the Court must examine, however, is whether Ali effectively communicated to Pierce regarding his right to testify, and if not, whether that failure rendered the representation deficient.

Here, Pierce has averred, and subsequently testified, that he expressed to Ali a desire to testify and that she ignored his repeated request by discussing other topics or informing Pierce that "she would get back to [him] on that." (*See* ECF No. 19-19; ECF No. 35 at 13–16.) Based on counsel's lack of advice in that regard, Pierce was under the mistaken belief that a *Sands* hearing must be held before his option of testifying would be discussed. (ECF No. 35 at 12–13, 20.) On that issue, I find Pierce's testimony credible, and there is no refuting evidence presented by Respondents. Indeed, Pierce's testimony paints a picture of a situation in which Ali failed to discuss with Pierce his right to testify either through mere inattention or, perhaps, because Ali had made a conscious, unilateral decision not to present Pierce's testimony. Regardless of the underlying reason, Ali's failure to have this discussion with Pierce resulted in counsel depriving Pierce of the opportunity to knowingly choose whether to take the stand or waive his right.

Either of these circumstances would render the representation manifestly deficient. In the event Ali inadvertently failed to discuss with Pierce his right to testify, she neglected her duty to protect one of the most sacred rights of a criminal defendant. *See Pennycooke*, 65 F.3d at 11-13. If, on the other hand, Ali's avoidance of the topic with Pierce was intentional, this is even more problematic. Clearly, a defense attorney's conduct falls below the acceptable constitutional threshold by making a unilateral decision on behalf of a defendant as to his right to testify, rather than advising the defendant that such a decision is his alone. *See United States v. Lore*, 26 F. Supp. 2d 729, 732, 739 (D.N.J. 1998).

Given these circumstances, the Court rejects Respondents' argument that Pierce should have independently expressed to the trial court his desire to testify. Had Pierce alleged that Ali had explicitly told him at some point that she did not plan to call him to testify, then Pierce's failure to raise the issue with the court could pose a credibility question. What Pierce in fact

presents, without contradiction, however, is that he did not understand the process and continued to believe that he and Ali could discuss whether he would testify up until the time Judge Snyder denied Pierce's request to testify during the charge conference. As a district court has previously observed in similar circumstances, it is unreasonable to ask that a criminal defendant "'ignore the admonishments of counsel, interrupt the trial proceedings, and interject himself, uninvited into the fray.'" *Lore*, 26 F. Supp. 2d at 737–38 (quoting *United States v. Martinez*, 883 F.2d 750, 770 (9th Cir. 1989) (Reinhardt, J., dissenting), *vacated by* 928 F.2d 1470 (9th Cir. 1991)). Thus, it would be unjust to disregard Pierce's Sixth Amendment ineffective-assistance-of-counsel claim on the basis that he did not independently and timely assert his right to testify because it was due to Ali's deficient representation that he did not fully understand how to preserve that right. And, tellingly, when Pierce learned during the charge conference that Judge Snyder considered him to have waived his right to testify, he addressed Judge Snyder directly and maintained that he was still under the impression that he could testify. (*See* ECF No. 19-47 at 153–54.) These circumstances support Pierce's assertion that he did not understand when his right to testify must be raised because Ali had not adequately discussed the matter with him. As such, I do not find that this claim is fabricated to obtain a "second bite at the apple." *See Martinez*, 883 F.2d at 761 ("Fundamental unfairness would characterize a process that let defendants have one trial based on their lawyer's strategy and another trial based on their own.").

Respondents also question Pierce's credibility by pointing out that this ineffective-assistance issue was not raised until his counsel raised it in his brief in support of the first PCR petition.[19] (*See* ECF No. 37 at 12.) Given the fact that Pierce is a layperson with limited

---

[19] The Court notes that Respondents do not argue that this issue is in any way procedurally barred.

experience in criminal trials,[20] the Court does not find this fact probative.  Accordingly, I find that Ali's representation was deficient, in that she failed to ensure that Pierce fully understood his right to testify and to ensure that he had an opportunity to make a voluntary and knowing decision whether to exercise that right.

Moving to the prejudice prong, Pierce must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  As previously noted, considering whether excluded exculpatory evidence resulted in prejudice requires the court to consider how the omitted evidence would have impacted the trial evidence as a whole if presented to an objective factfinder.  *See Ruiz*, 672 F. App'x at 210; *Saranchak*, 802 F.3d at 588, 599–600.  Here, Pierce's testimony before this Court supports a finding of prejudice resulting from Ali's deficient representation.  I find credible Pierce's testimony regarding his ongoing desire to take the stand in his own defense and that he would have testified even if that meant all his prior convictions would be admitted.  (ECF No. 35 at 9, 14–16, 20–24.)  While I acknowledge that Pierce stated he was waiting for Judge Snyder to conclude the *Sands* hearing, Pierce, however, perceived the completion of the hearing as a prerequisite to testifying—an erroneous perception that Ali failed to dispel—rather than a determinative factor as to his election to testify.  (*See id.* at 20–22 (Pierce answering "yes" to a question whether he understood that a *Sands* hearing "needed to occur first before you could testify").)  In sum, I find Pierce's testimony in this regard credible, and I further find that, if Ali had rendered adequate representation by discussing the right to testify with Pierce, there is certainly more than a reasonable probability that he would have testified.

---

[20] Pierce testified that, though he had a number of prior convictions, he had never participated in a trial prior to the conviction underlying the instant matter.  (ECF No. 35 at 8, 71.)

Continuing on the issue of prejudice, during the hearing before this Court, Pierce explained that, had he been permitted to testify during trial, he would have testified as to the following issues:

> That I did not shoot Mike Rozier, and I never met him and I don't know him, and that I should have had an opportunity to, you know, tell my side of what happened and that we never met. The only thing I know him from was through the sports world because I follow football.
> And, you know, Ms. Ali never gave me the opportunity to do that. And now I've been locked up almost 19 years for that because of the mistake she made, and I never got an opportunity to tell him that I never did it and I don't know this man.
> I was in prison the time that he said that he met me and knew me. And I was in Atlanta at the time that he said that he knew me. I don't know where he got that from. He just made a mistake or something.

(ECF No. 35 at 24–25.) Pierce further testified that, before the trial, he had never met or been in the same room as Rozier. (*Id.* at 25.) Pierce stated that, while Rozier testified at trial that he had met Pierce three or four times during the four or five years preceding 1996, Pierce had lived in Camden for only short, intermittent periods during that time. (*Id.* at 28–34.) He explained that he had 1) lived in Atlanta from August 1990 until January 1992 and again from October 1992 until January 1993; 2) lived in Glassboro, New Jersey, from June 1992 until September 1992; 3) been in jail from March 1993 until July 1993, and again from October 1995 until April 1996; 4) been in prison from September 1993 until April 1995; and 5) moved to Philadelphia in June 1996. (*Id.*)

Pierce explained that on the evening of November 5 and into the morning of November 6, 1996, he was "probably at home" in Philadelphia. (*Id.* at 38–39.) He then presented the following testimony regarding his typical practices at that time:

Q.      Why is it that you say "probably at home"?

> A.     Because I go pick -- when Marla got off from work, I
> would go pick her up and we would go back to Philadelphia
> because she worked in Camden.  So we would go back together to
> Philadelphia.
> Q.     Let's be clear.  You lived in Philadelphia.  Right?
> A.     Yes.
> Q.     Ms. Wallace worked in Camden.  Right?
> A.     Yes.
> Q.     You would escort her to the train station in Philadelphia in
> the mornings, generally.  Right?
> A.     Yes.
> Q.     And then would you go to Camden at that point in time
> with her?
> A.     No.
> Q.     And then in the afternoon you would go over to Camden?
> A.     Yes.
> Q.     And where would you go when you would go to Camden?
> A.     To her mother's.
> Q.     And then Marla would meet you there at her mother's after
> work?
> A.     Yes.  She would go there after work and I would pick her
> up and we would come back to Philadelphia.
> * * * *
> Q.     What time of day would you return back to Philadelphia
> with Ms. Wallace?
> A.     Some days it varied.  It might be 5 o'clock.  Some days it
> might be 6 o'clock or seven or eight.
> Q.     Generally in the evening?
> A.     Yes.
> Q.     Around dinner time plus or minus?
> A.     Yes.

(*Id.* at 39–40.)  Pierce testified that he first learned of the shooting in question from Wallace's

family members on the afternoon of November 6, 1996.  (*Id.* at 40–41.)

Given the limited evidence in the State's case, the Court finds that there is more than a

reasonable probability that, had Pierce presented his testimony at trial, an objective jury would

have reached a different conclusion.  Against the prosecution's case, which consisted almost

entirely of Rozier's testimony and his identification of Pierce more than a year after the shooting,

Pierce's own testimony would have bolstered Wallace's testimony in support of his alibi, would

have confirmed the testimony of eyewitnesses that Pierce was not present or the shooter, and also would have raised questions regarding the credibility of Rozier's assertions that he was previously familiar with Pierce.

Nevertheless, Respondents urge that Pierce's testimony "was a prosecutor's dream" as it "put him[] in Camden on the night of the shootings." (ECF No. 37 at 15.) What Pierce in fact testified to, however, was that he typically went home around dinner time, sometime between 5:00 and 8:00 p.m., (ECF No. 35 at 39–40), whereas the shooting occurred after midnight. Respondents also argue that Pierce "established that he was . . . in Camden for about nineteen months for Rozier to have met him the four or five times they crossed paths," arguing that,

> given [Pierce's] unemployed status around the time of the shootings, and the fact that he was in Camden every day during that time period, it was incredulous [sic] that someone who was admittedly followed [sic] Rozier through the sports world would never once have met Rozier who was such a celebrity in that very area.

(ECF No. 37 at 15.) While Pierce's movement during the five years before the shooting clearly does not render it impossible that he had met Rozier, the inquiry, however, is whether Pierce's testimony would have created reasonable doubt in an objective juror's mind; I answer that in the affirmative.

Respondents additionally contend that any help to Pierce's case from his testimony would have been outweighed by the harm caused from the revelation of his nine prior convictions. (ECF No. 37 at 15–16.) While exposure of Pierce's criminal record may not have been helpful to his case (except to the extent that prior convictions would support Pierce's testimony that he was in jail or prison during the time that Rozier claimed to have gained familiarity with him), the Court does not find that these prior convictions, which comprised mainly convictions for drug offenses and offenses against property, such as larceny and burglary, in addition to one

conviction for possession of a blackjack,[21] (*see* Evid. Hr'g Ex. 3, ECF No. 36-2), would likely have had a major impact on a reasonable factfinder regarding Pierce's credibility. None of the prior convictions involved a firearm, as was used in the shooting in this case. At the least, I am not convinced that Pierce's convictions—to the extent that they were admitted—would have been so prejudicial such that the jury would find the substance of Pierce's proposed testimony not credible.

In sum, the Court takes account of the fact that Pierce, had he testified, would have bolstered Wallace's testimony as to his alibi and would have cast doubt on Rozier's testimony that he knew Pierce on sight. Based on his testimony at the hearing, I find that Pierce could have been a credible and convincing witness. Although exposure of Pierce's criminal history could potentially have raised some issues as to his credibility, none of Pierce's prior convictions were similar to the underlying charges against him, and the time he spent in jail and prison supported his position that he did not know Rozier. Indeed, the testimony at issue here is not of a typical witness, but the crucial testimony of the defendant himself. As noted by the Supreme Court, "the most important witness for the defense in many criminal cases is the defendant himself." *Rock*, 483 U.S. at 52; *see also Ruiz*, 672 F. App'x at 210 n.4 (noting that "a defendant can be a uniquely persuasive witness"). Furthermore, the case against Pierce was certainly not "overwhelming," consisting solely of the testimony of one of two victims, who may have been under the influence of drugs and alcohol at the time and who did not come forward to identify Pierce as the perpetrator until a year after the incident. Importantly, the testimony of this victim was contradicted by two other eyewitnesses who testified that Pierce was not the shooter. Taking account of all these factors, the Court concludes that there is a reasonable probability

_____

[21]  As noted above, Judge Snyder had suggested that he would exclude a robbery and a blackjack conviction had Pierce testified. (*See* ECF No. 19-47 at 154.)

that, had Ali timely and adequately discussed with Pierce his right to testify that Pierce would, in

fact, have testified, and that the defendant's own testimony would have created a reasonable

doubt as to his guilt in the mind of an objective juror.  Accordingly, the Court grants Pierce's

habeas petition on this ground.

> ### ii.    Failure to Object to Defense Witness in Handcuffs and Alleged
> ### Hearsay

Pierce also contends that Ali was ineffective for failing to object to one of Petitioner's

defense witnesses, James Hymon ("Hymon"), testifying in handcuffs and prison garb and for

failing to object to alleged hearsay testimony from the prosecution's investigator, Gilbert.  (ECF

No. 1 at ECF pp. 37–40.)  Pierce first raised these claims on his appeal from the denial of his

first PCR petition.  (ECF No. 19-22 at 12–15.)  The Appellate Division found these issues to be

procedurally barred due to PCR counsel's failure to raise them during the initial PCR

proceedings.  (ECF No. 19-25 at 10–11.)  Nevertheless, the appellate court briefly addressed the

merits of the claim related to Hymon's testimony:

> We nonetheless note with respect to the issue of handcuffs
> that *State v. Artwell*, 177 *N.J.* 526, 536–37 (2003), held that "[t]he
> appearance of a defense witness in restraints undermines the
> credibility of the testimony that [the] witness offers on the
> defendant's behalf" and barred the general practice of handcuffing
> criminal witnesses unless necessary for security.  However, the
> *Artwell* Court specifically held, "*going forward*, a trial court may
> not require a defendant's witness to appear at trial in prison garb."
> *Id.* at 539 (emphasis added).  We decided the direct appeal on
> February 10, 2003, and the Supreme Court decided *Artwell* on July
> 2, 2003.  Defendant is not entitled to retroactive application of
> *Artwell* to the issue raised for the first time in his PCR appellate
> brief.

(ECF No. 19-25 at 11–12 (alterations in original).)

As noted above, this Court, in an abundance of caution, granted a request by Pierce to stay this proceeding so that he could attempt to exhaust these claims in the state courts. (*See* ECF No. 3.) Thereafter, Pierce filed a *pro se* petition seeking relief based on his PCR counsel's failure to raise claims of the ineffective assistance by Ali, which encompassed Ali's purported failures to object to Hymon testifying in handcuffs, as well as certain admissions of hearsay. (*See* ECF No. 19-31.) The Superior Court dismissed this petition, finding both claims procedurally barred as they had been raised on appeal in the first PCR proceeding. (ECF No. 19-32.) The court specifically found the Hymon-claim barred, "because it was raised in the appeal of [Pierce's] first PCR and the Appellate Division found it without merit." (*Id.*) It found the hearsay-claim barred and also observed that Pierce had "made an identical or substantially equivalent argument in [his] first PCR," which was denied, and the denial had been affirmed. (*Id.*)

On appeal, Pierce argued that the Appellate Division had not previously resolved these arguments on the merits, but instead declined to consider them. (*See* Ans., Ex., Letter Br., ECF No. 19-34, at 9.) The Appellate Division affirmed the second PCR denial "for substantially the same reason expressed by the second PCR judge." (ECF No. 19-36 at 4.) The Appellate Division also rejected Pierce's second PCR petition as untimely. (*Id.* at 6 ("It is clear to us that defendant failed to file his second PCR petition in a timely fashion.").)

Pierce now argues that the Appellate Division wrongly interpreted Pierce's Hymon argument on the appeal from the first PCR denial as claiming judicial error rather than ineffective assistance of counsel. (ECF No. 36 at 47–48.) He contends that the Appellate Division again erred in finding his second PCR petition untimely by measuring the one-year period from the Appellate Division's affirmance of the first PCR petition's denial, rather than

from the New Jersey Supreme Court's denial of certification. (*Id.* at 48–50.) Pierce alternatively argues that, assuming his claims could be considered procedurally defaulted, any such fault must be attributed to the ineffective assistance of PCR counsel, which demonstrates sufficient cause for the default. (*Id.* at 52.) Pierce contends that the establishment of the right to present defense witnesses free of restraints by the New Jersey Supreme Court, not until 2003, does not bar his claim, because other precedent already existed to show that prejudice would result. (*Id.* at 54–55.) Despite this body of case law, Pierce argues that Ali failed to object to Hymon's handcuffs and prison garb or ask for a curative jury instruction. (*Id.*)

I find that Pierce's claims first raised on his appeal of the first PCR petition—regarding Ali's failure to object to Hymon's testimony in handcuffs and prison garb and her failure to object to alleged hearsay by the State's investigator—were procedurally defaulted before the state courts. *See Coleman v. Thompson*, 501 U.S. 722, 729–32 (1991). Nonetheless, I find that, even if I were to apply a *de novo* standard of review to Pierce's claims, he has failed to prove a claim for ineffective assistance of counsel on these bases.

As noted by the Appellate Division, and urged by Respondents, the New Jersey Supreme Court did not hold until July 2003 that defense witnesses could not be required to testify in restraints without making a record of the reasons for doing so and may not be required to appear in prison garb. *See State v. Artwell*, 832 A.2d 295, 302–03 (N.J. 2003). Pierce argues that the potential for prejudice was clearly known pre-2003, as indicated by the *Artwell* court's citations to "multiple cases that predate Pierce's trial to support the basic proposition that a juror is less likely to believe the testimony of a witness if he/she is in handcuffs and prison clothes." (ECF No. 36 at 55.) Troubling as it may be, this Court cannot agree that such a right was so clearly established that Ali was deficient by failing to make an argument based on pre-*Artwell* case law.

Indeed, the *Artwell* court cited not only cases that had found a right to present defense witnesses free from restraints and prison garb, but also cases that reached the contrary conclusion.[22] *Artwell*, 832 A.2d at 300–01.  As this question was thus not settled in this jurisdiction at the time of Pierce's trial, and given the highly deferential standard of review, the Court does not find that Ali's failure to object to Hymon's testimony in handcuffs and prison garb or her failure to request special jury instructions were unreasonable under prevailing professional norms at the time.  *See Strickland,* 466 U.S. at 687–91.

Similarly, even if I were to excuse Pierce's procedural default on the argument that Ali was ineffective by failing to object to alleged hearsay testimony,[23] he still could not show that Ali provided deficient representation on this ground.  Wallace, as part of her testimony in support of Pierce's alibi defense, had previously testified that she recalled hearing about the shooting on a 5:30 a.m. news report, although she could not recall the exact date, only that it was a weekday.  (ECF No. 19-46 at 53–57.)  On cross-examination, she again testified, "I don't know what day it was. They said this evening, two men were shot in McGuire complex, that's it." (*Id.* at 60–61).  Upon further questioning, Wallace stated that the news report was phrased as if the shooting had happened the night before.  (*See id.* at 61.)

The prosecution then introduced testimony from prosecutor's office investigator Bruce Gilbert, who testified that, just before Wallace's testimony, she had told him that the broadcast she heard about the shooting was the 5:30 a.m. television news report of Channel Six, Action News.  (ECF No. 19-47 at 28–30.)  Gilbert specifically noted that Wallace had provided this information to him with no hesitancy.  (*Id.* at 30.)  Prior to Gilbert's testimony, the prosecution

---

[22]  The Court notes that all of these cases cited in *Artwell* are from other federal or state jurisdictions.  *See Artwell*, 832 A.2d at 300–01.

[23]  *See Trevino*, 569 U.S. at 428; *Martinez*, 566 U.S. at 9–14.

had introduced testimony from Cathy Simons, an Action News employee, to the effect that the story of the shooting first aired on Action News on the 5 p.m. broadcast. (ECF No. 19-47 at 19–23.)

Under the New Jersey Rules of Evidence, hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.J.R.E. 801(c). The Rules of Evidence further permit the use of prior inconsistent statements to impeach a witness's credibility. N.J.R.E. 607, 613, 803. The New Jersey Supreme Court has noted that, when a witness's prior statement "fails to mention a material circumstance presently testified to, which it would have been natural to mention in the prior statement, the prior statement is sufficiently inconsistent" to be used for impeachment purposes. *State v. Silva*, 621 A.2d 17, 21 (N.J. 1993) (internal quotation marks omitted).

Because Wallace had testified that she could not recall the specifics of the news broadcast, Gilbert's testimony served to refute Wallace's alleged failure to recall. Thus, his testimony was admissible as a prior inconsistent oral statement used to impeach the earlier declarant's denials. Because Gilbert's testimony did not violate the hearsay rule, Ali's failure to object clearly does not constitute ineffective assistance. Likewise, the failure to object to that limited testimony, admitted in the trial court's discretion, would not have altered the outcome of the trial. As such, the Court will deny habeas relief on these grounds.

### iii. Failure to Advise of Plea Offer

Pierce next raises a claim, previously asserted in his first PCR proceeding, that Ali provided deficient representation by failing to adequately advise him of a plea offer. (ECF No. 1 at ECF p. 40.) In the context of plea offers, counsel is obligated to provide information sufficient to allow the client to make an intelligent decision whether to plead guilty or proceed to trial. *See*

*Missouri v. Frye*, 566 U.S. 134, 141–47 (2011).  Thus, the deficiency prong of *Strickland* may be

satisfied by showing that defense counsel failed to notify a defendant of a formal plea offer that

could have been favorable to the defendant.  *Id.* at 145–47; *see also United States v. Dye*, 638 F.

App'x 117, 122 (3d Cir. 2015).  To demonstrate the prejudice prong of *Strickland*, petitioners

"must demonstrate a reasonable probability that they would have accepted the plea offer had they

been afforded effective assistance of counsel [and] . . . a reasonable probability the plea would

have been entered without the prosecution canceling it or the trial court refusing to accept it."

*Frye*, 566 U.S. at 147.

> The PCR trial court rejected this claim, finding,

>> With respect to the allegation that trial counsel failed to advise the
>> defendant on the State's plea offer, in this particular instance there
>> is little doubt that Judge Snyder did himself explain the plea offer
>> to the defendant.  It appears in the transcript, I think there is even
>> some reference to it in the discussion by counsel today.  The
>> bottom line being that there appears to be no prejudice to the
>> defendant even if his counsel failed to verily review the plea offer
>> with him -- or to review with him at all, since Judge Snyder clearly
>> did so on the record and, therefore, the second prong under
>> *Strickland* regarding prejudice is not met.

(ECF No. 19-50 at 23–24.)  The Appellate Division affirmed this result on the same basis.  (*See*

ECF No. 19-25 at 18–22.)  It explained,

>> The first reference on the record to a plea offer occurred on
>> August 9, 1999, during a pre-trial hearing.  At that hearing, the
>> judge, with defendant present, stated, "There has been an offer
>> extended; it's a flat twenty on both matters.  My understanding is
>> the defendant does not want that."  Confirming the terms of the
>> offer for the court, the prosecutor said, "the offer was a flat twenty
>> on both cases."  Defendant's attorney, who was not the same
>> individual who represented defendant at trial, said he "received
>> several communications from my client asking that this matter --
>> he doesn't wish this matter be postponed any further, that he wants
>> the matter to go immediately to trial.  This is against my advice."
>> Former counsel then stated, "You know, I'm putting my concern
>> on the record.  But, my client more than emphatically pointed out

he doesn't want this thing to be delayed any further and wants it immediately on the trial list and immediately tried."  Near the conclusion of the hearing, the judge asked former counsel if he wanted additional time to investigate the case or consider the plea offer.  After consulting with defendant, former counsel informed the judge that defendant "would like more time to prepare his defense."

During the second day of trial, the court again raised the topic of a plea agreement with defendant.  Addressing defendant directly, the court said,

> Mr. Pierce, just so you know it, there's been some discussion as a result of my intervention, quite honestly, concerning the possibility of negotiating a plea again contingent upon the presiding judge approving it, although I'm not asking you right this minute what your position is, it just would be helpful if you just listen to what your attorney has to say and what observations she has to make when reaching a conclusion, okay?  All right, Mr. Pierce?  Hear what I just said?

Defendant responded, "I heard you."

The trial judge mentioned plea discussions again the next day in the context of defense counsel's difficulty in securing the testimony of certain witnesses.  The judge said, "I talked to [defendant] Monday, said do you want to reconsider the opportunity to plead open.  In fact there's been continuing negotiations and discussions concerning a plea . . . ."  Later that day, the court addressed defendant directly:

> THE COURT:  Mr. Pierce, there's also been some discussions about pleas, I don't know if that's on or off anymore.  There would be no guarantee anybody would let you, at least the presiding judge would accept a plea agreement at any point in time.  You want to continue to discuss it with your attorney, that's up to you.  I can't tell you what if anything the State's position is because I did not involve myself any further in any plea negotiations.

> THE DEFENDANT:  Told me briefly yesterday and this morning.

> THE COURT:  I'm not trying to push you.  I don't care about it.  It's up to you.

> . . . .

THE DEFENDANT:  You just said it would be unlikely anyhow it would be accepted.

THE COURT:  Well, not your offer because that wasn't -- the State had offered before and I don't know if it's still on the table a 10 with some Brimage number which means a parole ineligibility.  I couldn't in good conscience with the charges outstanding allow you out on the street in any event even if the State said that's okay . . . .  I'm not participating in any great extent.  I'm asking the State what their position is.  I asked your attorney what her position is . . . .  I don't even know if you two reached an agreement whether or not the presiding judge would approve a plea agreement at this late date anyhow but --

THE DEFENDANT:  That would be your decision right?

. . . .

THE COURT:  No. My boss makes that decision.  . . . You want to continue those discussions, talk to your attorney.  If anything happens, have your attorney call [the prosecutor] and we'll see what the State's position is at that point in time . . . .

Examining the prejudice prong first, it is clear that defendant cannot establish a prima facie case of ineffective assistance of counsel.  Even if trial counsel failed to inform defendant of a plea offer, defendant cannot show he was prejudiced.

Defendant has failed to allege any specific facts proving that he was prejudiced by counsel's alleged error, such as the length of the plea offer and whether he would have accepted it. This further prevents defendant from establishing a prima facie claim of ineffective assistance of counsel. *Cummings*, *supra*, 321 *N.J. Super.* at 170 ("[I]n order to establish a prima facie claim, a petitioner must do more than make bald assertions that he was denied the effective assistance of counsel.").

(*Id.* at 19–22 (alterations and omissions in original).)  Having reviewed the relevant record, the

Court agrees with the Appellate Division that Plaintiff cannot meet the prejudice prong.  While

Pierce argues that Ali never discussed the details of the proposed plea deal with him, (*see* ECF

No. 23 at 17–18), the trial judge discussed the idea of a plea offer with Pierce on the record, but with no specifics, and had appraised him, "You want to continue those discussions, talk to your attorney," (ECF No. 19-47 at 157–58.)  There is no record of what discussions then ensued between Pierce and Ali, but there is no indication that the Appellate Division's analysis was contrary to or an unreasonable application of Supreme Court precedent or that it was an improper application of the facts, as would be required to grant relief on this claim under § 2254(d). Accordingly, the Court denies habeas relief on this basis.

### iv.  Failure to Move for a *Wade* Hearing

Pierce next claims that Ali provided ineffective assistance by failing to move for a *Wade* hearing and by failing to object to misleading assertions allegedly made by the prosecution in opposing a *Wade* hearing.  (ECF No. 1 at ECF pp. 40–41.)  Despite listing this as a ground for relief, Pierce does not actually otherwise argue that Ali failed to move for a Wade hearing, (*see id.*), and the record reflects that Ali did in fact seek a *Wade* hearing, which request Judge Snyder denied, (ECF No. 19-44 at 18–22).  Pierce contends, however, that Ali was ineffective by failing during the discussion of a *Wade* hearing to object to the prosecution's representation that the victims previously knew Pierce.  (ECF No. 1 at ECF p. 41.)  Pierce suggests no basis for Ali to have made such an objection, (*id.*), and the prosecution's statements were consistent with Rozier's subsequent testimony that he knew Pierce on sight, (*see* ECF No. 19-45 at 35–36).

In any case, the Appellate Division, on direct appeal, affirmed that no *Wade* hearing was needed.  (ECF No. 19-10 at 4.)  The PCR court denied relief on this basis, and additionally noted "no substantial likelihood of misidentification in this case."[24]  (ECF No. 19-50 at 28.)  Pierce

---

[24]  While this Court, under AEDPA, owes a high level of deference to the state courts' findings of fact, it is remarkable that the PCR court found "no substantial likelihood of misidentification in this case" despite the yearlong delay in Rozier's identification of Pierce, the testimony that Rozier may have been under the influence of drugs or alcohol, and thus subject to perceptional

raised this issue on appeal only by stating that "[a]ll claims made by Mr. Pierce *pro se* or by his PCR attorney which were not raised in this brief are incorporated in this appeal." (ECF No. 19-22 at 23–24.) The Appellate Division rejected this argument, finding that "Defendant's petition in support of PCR is bereft of any facts to support any of the [IAC] claims he makes, and we find them to be without merit." (ECF No. 19-25 at 12.)

This Court has no basis to find the Appellate Division's rejection of this argument unreasonable. All lower courts to have considered the question found that a *Wade* hearing was not needed, and, as discussed above, this Court has also found no error arising from the denial of a *Wade* hearing. Pierce, both before the state courts and before this Court, has raised only conclusory allegations of ineffective assistance of counsel on this basis. (*See* ECF No. 1 at ECF pp. 40–41.) Accordingly, Pierce demonstrates no basis under § 2254(d) for relief from the state courts' findings on these issues, and, even were the claims considered *de novo*, he makes no cognizable allegation of prejudice. Consequently, habeas relief is denied on this basis.

### v. Other Bases for Ineffective Assistance of Counsel

Pierce also asserts several other bases for alleged ineffective assistance of counsel, which he previously raised in his first PCR proceeding: that Ali failed to provide Pierce with certain discovery to permit him to aid in his defense; that Ali failed to subpoena an alleged eyewitness named James Orr; that Ali failed to vigorously cross examine the prosecution's witnesses; and that Ali failed to object to the prosecution's alleged use of Gilbert to harass Wallace before she testified. (ECF No. 1 at ECF pp. 41–42; *see also* ECF No. 19-17 at 10–13.) The PCR court found that Pierce had failed to meet his burden under *Strickland* of showing prejudice resulting

---

impairments, at the time of the shooting, and the testimony from two other eyewitnesses, both of whom were familiar with Pierce, but denied that he was present for the shooting. (*See* ECF No. 19-46 at 74–75; ECF No. 19-47 at 76, 131–38.)

from these alleged deficiencies in representation.  (ECF No. 19-50 at 28–30.)  As noted above, the Appellate Division further rejected these claims as "without merit."  (*See* ECF No. 19-25 at 12.)  Again, Pierce makes no showing that the state courts' rejections of these claims were contrary to established federal law or were based on an unreasonable application of the facts, as would be required for relief in this Court.  *See* 28 U.S.C. § 2254(d).  Indeed, Pierce does not even make any arguments why the Appellate Division's determination on these points should be found erroneous.  (*See* ECF No. 1 at ECF pp. 41–42.)  As such, habeas relief is denied as to these bases.

## V.    CERTIFICATE OF APPEALABILITY

Under 28 U.S.C. § 2253(c), a litigant may not appeal a final order in a § 2254 habeas proceeding unless the judge or a circuit justice issues a certificate of appealability ("COA"). That section further directs courts to issue a COA "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller–El v. Cockrell*, 537 U.S. 322, 327 (2003).  Under Federal Rule of Appellate Procedure 22, a certificate of appealability is not required when "a state or its representative" appeals.  Fed. R. App. P. 22(b)(3).

"When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, reasonable jurists would not find the Court's ruling debatable. To the extent that relief is granted on the petition, no certificate of appeal is needed for any appeal, and to the extent that relief on the petition is denied, a certificate of appealability is not warranted. Accordingly, no certificate of appealability shall issue.

## VI.    CONCLUSION

For the foregoing reasons, the Petition is granted on part A of Ground Five and Pierce's conviction is vacated. The remaining portions of the Petition are denied. The State shall have 30 days from the entry of the accompanying Order to determine whether to initiate a new trial against Petitioner or to release him from incarceration. No certificate of appealability shall issue. An appropriate order accompanies this opinion.

I further take this opportunity to thank the firm of Hangley, Aronchick, Segal, Pudlin & Schiller and individual counsel Jason Levine and John Stapleton for their able and vigorous advocacy devoted to the *pro bono* representation of Pierce. By gratuitously providing their services on behalf of Pierce and other indigent litigants, they, and all *pro bono* counsel, have played an integral part in ensuring that justice is fairly meted based on the merits of the arguments rather than the resources of the litigants. Counsel should know that their thorough efforts and distinguished advocacy have not gone unrecognized or unappreciated.

DATED:  September 19, 2018                              /s/ Freda L. Wolfson
                                                        FREDA L. WOLFSON
                                                        United States District Judge